FARR & BAILEY MFG. CO. v. INTERNATIONAL NAV. CO.

(Circuit Court of Appeals, Third Circuit. November 28, 1899.)

No. 13.

SHIPPING—DAMAGE TO CARGO—SEAWORTHINESS.

To constitute a ship seaworthy when she enters on a voyage, she must be fit, in design, structure, condition, and equipment; and she cannot be said to be fit, as to condition, when both the iron and glass coverings of a port, which it is the usual custom to close and fasten before sailing, though structurally fit, are, through inadvertence, insecurely fastened, so that, although the vessel does not encounter bad weather or rough seas, such covers become open, and admit sea water, which damages the cargo. In such case the damage must be held to result from the unseaworthiness of the ship, and not from any fault or error in navigation, or in the management of the vessel, for which the owners are exempted from liability by section 3 of the Harter act, as the master was justified in supposing that the port had been securely closed before sailing, in accordance with the usual custom, and was not chargeable with fault in failing to cause it to be thereafter examined, although the cargo was so stored that it was accessible.

Gray, Circuit Judge, dissenting.

Appeal from the District Court of the United States for the Eastern District of Pennsylvania.

For opinion below, see 94 Fed. 675.

Horace L. Cheyney, for appellant.

J. Rodman Paul, for appellee.

Before ACHESON, DALLAS, and GRAY, Circuit Judges.

DALLAS, Circuit Judge. By the libel filed in the court below **damages** were claimed for injury done by sea water to several bales of burlap which were received on board the steamship Indiana at the port of Liverpool, consigned to the libelant, in Philadelphia. These goods were stowed in a compartment on the lower steerage deck in such manner as to admit of free access being had to the port through which the water subsequently entered. This port, and others similarly situated, were inspected on the day before the vessel sailed, and they were believed to be closed and properly fastened; but, after the Indiana had proceeded for four or five days upon her voyage, water made its appearance in the compartment, and a day or two later investigation disclosed that both the glass cover and the iron dummy of the port in question were open, and that through this opening the water was admitted. There had been no severe weather, no accident was known to have happened, and the port, its covers, fastenings, and surroundings, did not appear to have been in any way broken or impaired.

The bearing upon the case thus presented of the act of congress of February 13, 1893, known as the "Harter Act," is now for consideration. The third section of that act provides that:

"If the owner of any vessel transporting merchandise to or from any port in the United States of America shall exercise due diligence to make the said vessel in all respects seaworthy and properly manned, equipped and supplied, neither the vessel, her owners, agents or charterers shall become or be held responsible for damage or loss resulting from faults or errors in navigation or in the management of said vessel."

This act has not modified the obligation of owners to furnish a seaworthy ship. The Delaware, 161 U. S. 459, 16 Sup. Ct. 516, 40 L. Ed. 771; The Carib Prince, 170 U. S. 655, 18 Sup. Ct. 753, 42 L. Ed. 1181; The Silvia, 171 U. S. 462, 19 Sup. Ct. 7, 43 L. Ed. 241. Did the damage in question result from unseaworthiness? Respecting its immediate cause there can be no doubt. It was the condition of the port. Was this condition chargeable to unseaworthiness, or should it be ascribed to lack of due care, skill, or judgment on the part of those engaged in navigating and managing the vessel? The definition of "seaworthiness" which the learned counsel for the appellee has supplied from Carver on Carriers by Sea (section 18, p. 20) is, so far as it is here material, that "the ship must be fit in design, structure, condition, and equipment"; and, although the Indiana seems to have been structurally fit, her "condition," as respects the port in question, was, we think, palpably unfit. The learned judge of the court below found as a fact that it "was either not fastened at all, or was insecurely fastened," and this finding is quite consistent with the contention of the appellee's counsel that it was not open at the time of sailing. The impression made upon us by the evidence is that it was probably closed, but, be this as it may, certain it is that it was not securely fastened; and we are of opinion that by reason of this fact the vessel was unseaworthy, for the conclusion is inevitable that a ship with a hole in her side, which those in charge

of her navigation suppose, and have a right to assume, is tightly closed, but which in fact had been so inadequately fastened as to admit of its being opened by ordinary pressure of the sea, and so permit the water to flow in upon the cargo, does not "have that degree of fitness which an ordinary careful and prudent owner will require his vessel to have at the commencement of her voyage, having regard to all the probable circumstances of it"; and "to that extent   *   *   *   the shipowner undertakes absolutely that she is fit, and ignorance is no excuse." Carv. Carr. by Sea, supra. It has, however, been contended that the master of the Indiana had no right to assume that the covers of this port had been properly secured, but should himself have made timely discovery that they had not been, and therefore that his omission to have them made fast during the voyage, and before the damage had been done, was a fault in navigation or in management, for which the vessel is not liable. We cannot sustain this contention. The record shows that the custom was to close and securely fasten all such ports before sailing, and that in this instance this practice, except as to this one port, was effectually pursued. The master was, of course, not responsible for the vessel's general fitness of condition, and, this being so, we are at a loss to conceive upon what ground neglect could be imputed to him by reason of his not having seen to the condition of this particular part of the ship at a time when its unfit condition had not become known to him. This case was twice argued in the court below. Upon the first occasion the learned judge directed a decree to be entered for the libelant, but upon reargument he dismissed the libel. In all that he said in support of the conclusion which he first announced, we fully concur; but we are unable to acquiesce in the result which he finally reached, because we cannot agree that it was rendered necessary by the decision in the case of The Silvia, 171 U. S. 462, 19 Sup. Ct. 7, 43 L. Ed. 241. The facts of that case and of this one, though similar, are not precisely the same; and the differences between them, though seemingly slight, are, when considered with reference to the reasoning upon which the judgment in the Silvia Case was founded, of controlling importance. It was there said that "the test of seaworthiness is whether the vessel is reasonably fit to carry the cargo which she has undertaken to transport"; and, applying this test, it was held that the Silvia was not, under the circumstances there presented, to be regarded as being unseaworthy, merely because at the time of sailing, when the weather was fair, and with the glass covers tightly closed, the iron covers of some of her ports were left open to light the compartment. There was in that case, as in this one, no structural defect or omission of appliances, and the question there, as here, was only as to fitness of condition. The compartment involved contained no cargo, but only spare sails and ropes and a small quantity of stores. The ports were in a place where the iron shutters would usually be left open for the admission of light, and there was nothing to prevent or embarrass access to them in case a change of weather should make it necessary or proper to close them. In the afternoon of the day of sailing rough weather was encountered, the glass cover of one of the ports was broken, and

the water came in through the port and damaged the cargo; and this damage, it was held, was occasioned, not by unseaworthiness, but by fault or error in the navigation or in the management of the ship, because the control during the voyage of everything with which the vessel is equipped for the purpose of protecting her and her cargo against the inroad of the seas is included in navigation and management, and consequently the neglect to close the iron covers of the ports was in that case ascribed to those in charge of the navigation and management, and not to those responsible for seaworthiness. But in the present case the port in question was not designedly left open, and its shutters ought not to have been left unfastened. They would not "usually be left open for the admission of light," or for any purpose. They were believed by all concerned to have been securely closed, and that they would remain so throughout the voyage. It was neither intended nor expected that they would require or receive any attention at sea. It was not supposed that any control of them in the course of navigation and management would be necessary, and no duty to exercise control existed, simply because no need nor occasion for it could have been foreseen or perceived. If, as in the Silvia Case, the compartment in question had contained only tackle and stores, and if, as in that case, the glass cover had been closed, but the iron cover left open to admit light, it would unquestionably have been the duty of the master, upon encountering rough weather, to have had the iron cover closed; but he cannot be justly said to have committed either a fault or an error in omitting to remedy a defect of which he had no knowledge, and for the existence of which he was in no way responsible. The fact that in the Silvia Case, as in this one, the cargo was not so stored as to prevent access to the port, does not make the judgment in that case decisive of this one. There it was said that, if the cargo had been so stored as to require much time and labor to shift or remove it in order to get at the ports, the fact that the iron shutters were left open at the beginning of the voyage might have rendered the ship unseaworthy; but it was not decided that, under all circumstances, freedom of access to the ports of a vessel imposes upon those engaged in her navigation and management a duty to inspect them. On the contrary, it seems to us that what the court said about this matter accords with our present conclusion; for, if a ship be "unseaworthy at the time of sailing, by reason of the cargo having been so stowed against the open port that the port could not be closed without removing a considerable part of the cargo," it would seem that there must likewise be unseaworthiness wherever, for any cause, it would be unreasonable to expect the master to investigate a port which had not been fastened at the time of sailing; and that such expectation would not have been reasonable, and in fact was not entertained, in this case, has already been shown. The decree of the district court is reversed, and the case will be remanded to that court, with direction to enter a decree adjudging the respondent to be liable for the damage complained of by the libelant, and referring the case to a commissioner to determine the extent of the loss.

GRAY, Circuit Judge. I cannot agree with the majority of the court in the conclusion reached by them in this case. Entirely aside from the question of the applicability of the decision of the supreme court of the United States in the case of The Silvia, I think the owners of the Indiana, on the facts disclosed in the record, are within the exemption provided for in the third section of the act of congress known as the "Harter Act." If the ship, when she left port, was not defective in structure or equipment, she was, within every reasonable definition of the term, seaworthy. There is no suggestion that her equipment in the matter of ports or deadlights was defective. If properly equipped with hatch coverings and tarpaulins, it does not render a ship unseaworthy, if they are left open or insecurely fastened. If they are, it is a fault of the navigation or management. So, if a ship is properly equipped with anchors, and the requisite tackle for stowing them, it does not render her unseaworthy, if on leaving port the anchors are allowed to swing from the catheads, whereby there is danger of knocking a hole in the bows when the ship encounters head seas. It is a fault of the management and navigation to so leave them. In the case of Hedley v. Steamship Co. [1894] App. Cas. 222, a ship sailed with stanchions and rails on board, but not set up as they ought to have been. A storm coming on, a seaman engaged in performing his duty fell overboard in consequence of the neglect to ship the stanchions and rails, and was drowned. The house of lords held that this was a neglect of duty, but did not render the ship unseaworthy. Lord Herschell said:

"After she left port, her hull and equipment remained precisely what they were at the time of her departure. She was in all respects efficiently equipped. The fault was in not making use of the equipment with which she had been furnished. * * * The failure to properly secure many parts of the ship which are in ordinary practice open, from time to time, would no doubt diminish the safety of those serving on board her, and be a source of danger to them; but I do not think it could be reasonably said that because, in such a case, a bolt was not securely fixed, the vessel therefore became unseaworthy."

The reasoning in the case of The Silvia, 171 U. S. 462, 19 Sup. Ct. 7, 43 L. Ed. 241, however, seems to me on every point applicable to the present case, and to be of binding authority on this court, as it was considered to be by the learned judge of the court below. The facts in that case were precisely like those in the present case; the only difference being that in the Silvia the iron cover over the port was left open, while in the Indiana the glass cover was left open or insecurely fastened. I think the decree of the court below should be affirmed.