## THE MANITOBA.

### PUTNAM v. THE MANITOBA et al. (two cases).

(District Court, S. D. New York. September 20, 1900.)

1. Shipping—Damage to Cargo—Harter Act—Efficient Cause of Loss.
   To entitle the shipowner to exemption from liability under the third section of the Harter act, the damage must have "resulted" from the causes therein specified. If the causes of the loss are several, one of which is negligence of the carrier not within that section, and that negligence, and not the sea peril, would, under the settled rules of construction as between ship and shipper, be deemed the efficient cause of the loss, then the exemption of the statute does not apply.

2. Same—Damage to Cargo—Unfastened Porthole—Seaworthiness.
   The steamer M. carried case goods in a between-decks compartment in which was a port 8 or 10 feet above the water line. While on a voyage from New York to London this port was found open, having let in sea water which damaged the cargo, as the port had been unfastened at the inception of the voyage. The compartment was filled with case goods,

so that in order to close the port from the inside during the voyage it would have been necessary to open a hatch that was battened down and remove cargo in order to get to the port. Evidence was given that the port had been once closed by the carpenter when the loading began, and the cause of its being afterwards opened during loading did not satisfactorily appear; the most probable surmise being that it was done by workmen engaged in stowing the cargo, who afterwards forgot to refasten the port. *Held*, that the open port at the beginning of the voyage, the condition of which was unknown to the officers of the ship, made the ship unseaworthy as to cargo stowed in that compartment, since knowledge that such a port is open is one of the indispensable requisites and conditions for closing it when necessary during the voyage.

8. SAME.
    The failure of the owner to maintain a watch on the ports during loading, and the negligence by which the port was suffered to remain open when the ship sailed, *held* a failure "in proper stowage, care and custody" within the first section of the Harter act.

4. SAME—HARTER ACT—"MANAGEMENT OF THE SHIP."
    *Held*, that whether the term "management of the ship," within the third section of the Harter act does or does not include the care of the ports in the immediate preparation for the voyage, negligence in the care of the ports, so far as necessary to seaworthiness, is not excused by that section, because the shipowner is himself made answerable by that section for due diligence in the fitness of the cargo compartments, including the closing of the ports or other acts necessary to seaworthiness of the vessel, so that he is answerable for a failure by any of his servants in that regard.

5. SAME—BILL OF LADING—EXEMPTION OF "ROBBERS" AND "BARRATRY."
    It was urged that the port had been opened feloniously in an attempt at theft; *held*, (1) that there was no sufficient evidence of such acts, and (2) quære, whether in any event the exemption of "robbers" and "barratry" could be extended beyond the direct and proximate consequences of accomplished acts of theft or robbery or to mere incidents of such attempts unaccomplished, which diligence would have avoided.

6. SAME—BILL OF LADING—EXEMPTION FOR LATENT DEFECTS.
    The bill of lading exempted the carrier for "latent defects even existing before shipment or sailing on the voyage; *held*, that an open port, though unknown to the master before sailing, was not such a "latent defect."

7. SAME—DAMAGE TO CARGO—BILL OF LADING—EXEMPTIONS TO APPLY "DURING LOADING"—HARTER ACT.
    A bill of lading provided that the exemptions therein "shall apply not only during the loading and voyage, but during the discharge and until the goods are actually delivered to the consignee"; *held*, that the shipowners' exemptions were not thereby extended in this case, since the bill of lading in adopting only the Harter act exemptions in these respects, expressly excluded all losses resulting from negligence in regard to seaworthy conditions.

In Admiralty.

Conway & Westbrook (Harrington Putnam, of counsel), for libelant. Convers & Kirlin, for claimant.

BROWN, District Judge. On a voyage of the steamship Manitoba from New York to London in June, 1896, some cases of cigarettes belonging to the libelant, stowed in compartments Nos. 3 and 4, between-decks, were damaged by sea water, which came in through an unfastened port. The libel was filed to recover the damages, alleging negligence and unseaworthiness, which the answer denies, averring that the port was properly closed and fastened, but afterwards wrong-

fully opened by the servants of the stevedores (who were brought in as defendants under the fifty-ninth rule), and setting up exemptions under the bill of lading and also under the Harter act.

The Manitoba is a first-class twin screw steel steamer, built in 1892, 445 feet long, by 49 feet beam, with four decks, 5,672 tons gross register, and engaged in carrying passengers and freight between New York and London.

Compartments 3 and 4 in the between-decks were not separated. In those compartments there were two hatches, and on each side four portholes. The second port forward of the aft bulkhead on the starboard side was the port through which the water entered. It was from 8 to 10 feet above the water line, about 2 feet below the deck above, and was abreast of hatch No. 4. It was provided with a glass door swinging horizontally, and an inside cast-iron door, or dummy, or dead-light, as it is variously called, swinging downwards from the top; each door when properly closed was water-tight. A room in the between-decks about 8 feet by 10, nearly under hatch No. 3, was partitioned off and partly filled with passengers' luggage. Two days before the steamer reached London, when off the Scillys, the floor of that room was found wet, as well as the deck adjoining. As the cargo was stowed up to the beams or nearly so, the examination of the ports for the purpose of discovering the cause of the leak, was made from the outside of the ship, when it was found that the port in question, though apparently closed, could be pushed inwards about four inches. The port being so much above the water line, and the sea being then smooth and the weather mild, it was not deemed necessary to fasten the port for the rest of the voyage, and it was left as it was until arrival at London on the 24th, when upon an inside examination it was found that the lugs of the glass door and of the iron dummy of the port were unfastened and hanging loose.

On the second day out the vessel had met high head winds and a heavy sea, causing her to roll and pitch heavily for about 24 hours, and to take in great quantities of water forward. There are numerous entries in the log to this effect. The rolling of the ship in that rough weather would no doubt force sea water through the unfastened port, and it is conceded that this was the cause of the damage. The vessel on arrival had a list to port; both scuppers on that side in compartments 3 and 4 of the between-decks were stopped up, and there was a foot of water above the dunnage on the port side. The flow of water through the port, and its swashing back and forth in the rolling of the steamer, are sufficient to account for the damage.

I think it must be found upon the evidence, that this port was duly closed with the other ports at the time when the loading of cargo commenced in compartments 3 and 4 of the between-decks, at about 4 or 5 o'clock in the afternoon of Friday, June 12th. The loading of all the holds was completed by the stevedores at midnight of that day, and the vessel sailed at 9 o'clock the next day, after taking some cattle on board that morning. The ordinary practice is, that before loading a compartment the ship's carpenter or his mate shall carefully inspect the ports and see that they are properly fastened. The evi-

dence shows that when the stevedore's men began to load compart-
ments 3 and 4 in the between-decks, the carpenter was called on to
close the ports, but that being busy with caulking the bridge, he sent
his mate, Mitchell, an experienced man, to close them, in company
with Muirhead, the third officer. Mitchell testifies that when he
began to close the ports between-decks, the stevedores were still en-
gaged in loading the lower hold of No. 4 compartment. The testi-
mony is most explicit that Mitchell examined every port and properly
fastened every one with a spanner. The third officer testifies that
he went along with Mitchell and with his own hands tried every port
and found every one screwed up fast. The carpenter testifies that
before 6 o'clock he himself went down and examined them all again
except the aft port, which was then blocked up by cargo, and found
them tight. The third officer reported to Luckhurst, the chief officer,
that the ports had been properly fastened, and the chief officer him-
self also went into the compartments and saw that the ports were
closed. The fourth officer testifies that at about 4 p. m. he casually
went into No. 3, and tried all the ports with his hand, before any
cargo was stowed there, and found the ports all closed (this was
probably on his second visit, not the first); that afterwards at supper
time between 5 and 6 o'clock he went there again, and saw the
carpenter come in and examine the ports and that he then told the
carpenter that they were all closed. Two of the stevedore's men
testify to seeing both the carpenter and his mate trying the different
ports. No stronger direct evidence could well be produced of the
due closing of the port in question, and that it was seen to be closed
as late as about 6 p. m. of the evening before sailing, and after the
cargo had been partly stowed in the after part of compartments 3
and 4.

The libelant's counsel cites passages in the testimony indicating
that some goods were stowed in place in the between-decks near the
aft bulkhead before the ports were closed. But these passages do
not prove that the port in question or any of the ports were blocked
by cargo before being closed as stated by the witnesses above referred
to; nor do they prove any substantial departure from the custom to
close the ports before loading a compartment. The aft port near the
bulkhead, which was blocked when the carpenter tried them, was in
fact closed. The port in question, the one next forward of it, was
situated 23 feet forward of the aft bulkhead in that compartment,
i. e. about one-third the whole length of Nos. 3 and 4 compartments,
and it was high up near the beams above; so that it is clear from the
evidence that at the time when the ports were closed and examined
by the different witnesses, no such amount of cargo could have been
taken into the between-decks as to obstruct access to this port, or a
perfect observation of its condition. The fourth officer says that
when the last examination was made by the carpenter, only about 8
feet of space at the rear was filled up with cargo. While it is possible
that this port might have been missed by all these witnesses, it is
in the highest degree improbable; and it is scarcely credible that the
two nuts of the port could have been off and the lugs left hanging.

down unfastened, without attracting attention upon even the most casual inspection, or that they could have escaped the notice of the third officer and the carpenter's mate and afterwards of the carpenter himself, when each of them made it his special business to see that the ports were closed; and their testimony is corroborated by four other witnesses.

The respondent contends that the port was afterwards, during loading, wrongfully unfastened, either by some one of the stevedore's men for air and ventilation, as set up in the answer, or by some person unknown for the purpose of pilfering cigarettes from the boxes and passing them through the port to a confederate outside. This last theory, which was suggested at the trial, is based upon the fact that at about the same time complaints were received of cigarettes missing from similar cases shipped on other steamers of this line, and upon the further fact that the situation of the port in question was such as would be likely to be availed of by persons of thievish intent, as it was above the string piece of the wharf where the steamer lay, and beneath the gangway planks leading off the ship, so that operations through that port would be partly screened from observation. The third officer also says that on arrival at London one of the cases near the port was found out of place, "right on top of the others," suggesting an interrupted attempt at pilfering after the loading around that port was completed. Whatever the circumstance referred to by him may have been, it might arise from various causes, and standing alone is not sufficient evidence of intended theft. But I do not comprehend his testimony on this point. As the space was filled up with boxes as high as they would go in, I do not understand how any one box could be put "right on top of the others." There could be no such displacement in the top tier; and the port was so high up that only the top tier of boxes prevented the glass port from being shoved in more than four inches when discovered; while the fact that the port could be opened no further, shows that the top box was in place next to the port. This fact is further inconsistent with the theory of intended theft; since when the top tier was in place, there were only four inches of dunnage space between the box and the port, and that was insufficient for opening the port either with a spanner, a cargo hook, or a piece of dunnage as suggested.

However opened and by whomsoever done, the port must have been opened early in the loading of compartments 3 and 4, before the upper tier of boxes was in place about that port, and before the box that afterwards prevented opening further was put in position. I do not find any actual fact or circumstance in the evidence distinctly sustaining the theory of intended theft, though that may be possible. No cigarettes were missing; no box was opened; none of the sailor men were seen in that compartment; no stranger was found there, nor any suspicious characters outside; the loading was completed by midnight and the hatches at once battened down; and after that, it was practically impossible for a thief to reach the port. I cannot give this theory, therefore, any higher status than an unproved possibility.

There is no direct evidence implicating any of the stevedore's workmen. In compartments 3 and 4 amidships there were four at work on each side. The four from the starboard side, where this port was, were called as witnesses, and they all say that they did not touch the port or see it open while loading, though two testify that they saw the carpenter's mate and the third officer at work closing the ports. All the stevedore's men knew that they had no right to touch the ports after they were closed and would be liable to discharge if they did. The four who worked on the port side were not called.

On the other hand, no persons other than the stevedore's men and the ship's officers were seen or known to be in compartments 3 and 4 between 4 p. m. and midnight. The evidence seems to exclude the probability of any outsider being there. None of the crew had any business there and none of them were seen there. It was a night in June, hot and stifling; grain in bulk was loading in the lower hold of No. 4 compartment by a spout, making a suffocating dust, as Tribe says, in the between-decks; and one of the stevedore's men engaged in that work complained of the dust and heat, and objected to the closing of the ports on that account. Mitch. Mar. Reg. pp. 72, 73, 85, 86, 96. The officers assigned to the watch there were more or less absent, and, as is evident from their testimony, they did not maintain a strict watch on the men or the ports. There was opportunity, therefore, which the officers admit, for any of the workmen wishing to open the port to do so unobserved. The most probable surmise, therefore, is that the port was opened by some of the workmen for relief from the heat and dust at about the time of their return from supper at 7 p. m. with the intent, likely enough, to close the port before leaving, but afterwards forgetting to do so. In the absence of all direct evidence against the workmen, however, these circumstances, though highly suspicious, are not sufficient, I think, in view of other possible explanations, to warrant a decree against them. I can only find, therefore, that while this port may possibly have been originally passed by the officers as apparently securely fastened when it was not, it is more probable that it was duly fastened before loading, and afterwards opened during loading by some person not ascertained.

2. The ship as a common carrier, is liable for the cargo damage unless it was caused by sea perils without the ship's fault, or unless she is exempted by some provision of the bill of lading, or by the Harter act (Act Feb. 13, 1893). The bills of lading put in evidence except—

(a) "Loss or damage occasioned * * * by barratry of the master or crew; by robbers; by latent defects in hull even existing before shipment or sailing on the voyage, provided the owners have used due diligence to make the vessel seaworthy."

(b) Both also provide that the shipment "is subject to all the terms and provisions of and all the exemptions from liability contained in the Harter act."

(c) One only of the bills of lading contains the following:

"The exceptions and conditions enumerated in this bill of lading shall apply not only during the loading and voyage, but during the discharge and until

the goods are actually delivered to the consignee; and the persons handling the goods or grain in the ship * * * shall be deemed the servants of the shipowner."

The open port, though unknown to the master on sailing, was not a "latent defect." The Phœnicia (D. C.) 90 Fed. 118. If it was the result of an attempt at theft by some of the crew, though theft might have been a barratrous act (Insurance Co. v. Bryan, 26 Wend. 563; Spinetti v. Steamship Co., 80 N. Y. 71), still, inasmuch as no theft was accomplished, there was in fact no actual barratry; and the exception of "damage occasioned by barratry" does not seem to extend to a mere incident of an attempted act of barratry which was not accomplished. And even if the term "robbers" in these bills of lading, in the absence of the usual term "thieves," could be construed as used in its most broad and general sense and as including theft (Cent. Dict. 7), as used in Shakespeare's lines,

> "Thieves for their robbery have authority when
> Judges steal themselves,"

—rather than in the limited technical sense of a taking by open violence only, still it is doubtful, I think, whether the phrase "loss or damage occasioned by robbers" could be extended beyond the direct and proximate consequences of accomplished acts of theft or robbery, or so as to include ultimate consequences which the ship's diligence would have avoided and dependent upon subsequent navigation in heavy weather.

3. The claim to exemption must, therefore, rest, I think, upon the provisions of the Harter act, which by reference are expressly adopted in the bills of lading. Such a reference, it has been held, is equivalent to a recital in them of all the provisions and exemptions of that statute (Dobell v. Steamship Rossmore Co. [1895] 2 Q. B. Div. 408); so that these provisions and exemptions have here the force both of statute and of contract.

The recent decisions of the supreme court in the cases of The Carib Prince, 170 U. S. 655, 18 Sup. Ct. 753, 42 L. Ed. 1181; The Irrawaddy, 171 U. S. 187, 18 Sup. Ct. 831, 43 L. Ed. 130; The Delaware, 161 U. S. 459, 16 Sup. Ct. 516, 40 L. Ed. 771; The Silvia, 171 U. S. 462, 19 Sup. Ct. 7, 43 L. Ed. 241; and The G. R. Booth, 171 U. S. 450, 19 Sup. Ct. 9, 43 L. Ed. 234,—have cleared away some previous doubts as to the construction and extent of this statute.

In The Carib Prince it was contended that the former general rule of law which made the owner answerable for the seaworthiness of his ship on sailing, was superseded by the obligation of due diligence only to make her so. But the supreme court in that case overruled that contention; and it appearing that the damage there resulted from a defective rivet in a ballast tank,—a latent defect in construction,—and not from any danger of the seas or from any fault or error in the navigation or management of the ship, which are the only exempted causes designated in the third section, the court held in that case (and the same rule no doubt applies to all cases not specifically included in the third section), that the responsibility of the owner for absolute seaworthiness remained as before.

In The Delaware, the act was held not intended to affect the mutual rights and obligations of vessels in cases of negligent collisions; and similarly in The Irrawaddy, it was held that the act should not be construed as effecting any change in the owner's previous inability to recover in general average his sacrifices in rescuing ship and cargo from sea perils caused by the ship's negligence, merely because his exemption by the act from liability for that negligence might seem logically to give him a right of recovery; since the subject of general average was not apparently within the contemplation of the act.

In The Silvia, where an inside iron shutter to the port in a compartment having no cargo and easily accessible, but which ought to have been closed in stormy weather, was knowingly left open by the officers before sailing, and no attempt was made to shut it on the approach of bad weather, it was held that the vessel was seaworthy on sailing, and that the damage from sea water, which came in on the breaking of the glass port, resulted from "fault or error in the management of the vessel," for which the ship and owner were not liable.

In The G. R. Booth, the phrase "danger or peril of the seas" was critically considered, and held not to include a damage to cargo by the immediate inflow of water upon it through a hole made in the side of the ship below the water line by an explosion without any fault of the ship, inasmuch as the damage was there the immediate, direct and necessary result of the explosion, without the intervention of any new or other agency disconnected from the explosion, as the primary cause. Railway Co. v. Kellogg, 94 U. S. 469, 24 L. Ed. 256.

The supposition that the supreme court has held that in cases where the damage results from the specific causes named in the third section of the Harter act, the owner is still responsible for the absolute seaworthiness of the ship as before, is I think mistaken. I do not find any such adjudication; and the terms of the third section as respects damages "resulting" from the causes named in it, are explicit to the contrary. See, also, The Irrawaddy, 171 U. S. 187, 18 Sup. Ct. 831, 43 L. Ed. 130, at page 192, 171 U. S., page 833, 18 Sup. Ct., and page 132, 43 L. Ed., per Mr. Justice Shiras. The question has not in fact been presented to the supreme court; not in The Carib Prince, because there the cause of damage was not within the third section at all; and the Harter act as Mr. Justice Brown there said, "cut no figure in the case" (170 U. S. 655, 664, 18 Sup. Ct. 753, 757, 42 L. Ed. 1181, 1187); not in The Silvia, because the ship was there held to be seaworthy, so that the question did not arise. As respects general expressions having reference to a different state of facts, the admonition of Mr. Justice Gray is pertinent, given in a still more recent case (Bardes v. Bank, 178 U. S. 524, 534, 4 Am. Bankr. R. 163, 172, 20 Sup. Ct. 1000, 1004, 44 L. Ed. 1175), quoting the language of Mr. Justice Curtis in Carroll v. Carroll's Lessee, 16 How. 275, 287, 14 L. Ed. 936, 941, that "any opinion given here or elsewhere, cannot be relied upon as a binding authority, unless the case called for its expression."

In cases where the damage must be deemed to have "resulted," not from any defect in the ship or the condition of the compartments as the efficient cause of the loss, but from some one or more of the

causes specified in the third section as the real and efficient cause, the ship and owner are by the express terms of the act made answerable only for the exercise of due diligence to make the ship seaworthy. Such cases, though perhaps rare as compared with those in which negligence is present as an efficient factor, may occasionally arise, as indicated by Mr. Justice Shiras in The Irrawaddy, supra, through strictly latent defects not avoidable or discoverable by the highest diligence or care, either in construction or in subsequent inspection or management. The causes for exemption specified in section 3, are five, viz.:

(a) Fault in the navigation of the vessel; (b) fault in the management; (c) error in her navigation; (d) error in her management; (e) "danger of the seas or other navigable waters."

According to the criteria stated in The G. R. Booth, supra, the direct and immediate cause of the damage in this case was a "danger of the seas," viz. the excessive rolling of the ship in heavy weather, which caused sea water to be injected through the unfastened port. The rolling of a ship in heavy weather is a sea peril. Whether the damage in this case is to be treated as having "resulted" from that cause, so as to make the third section govern the case, is a different question. There were numerous causes contributing to the result:

First, the wrongful opening of the port; second, remissness of the watch in not observing and again closing it before sailing, as I find hereafter; third, the failure of the officers to close the port on the approach of bad weather after the vessel sailed; fourth, a high wind and heavy sea and consequent heavy rolling which forced water through the port; and, fifth, the clogging of the port scuppers, which prevented the water from draining off and thereby caused an accumulation of water a foot in depth above the dunnage, by the swashing of which a large part of the damage to the between-decks cargo was probably done. These were each new and independent agencies; the last two were long subsequent to the wrongful opening of the port or omission to close it, and disconnected therefrom. Any such rolling moreover, as would reach a port 10 feet above the water line, was not a necessary incident of the voyage. Voyages with less rolling in the month of June, when this trip was made, are not infrequent. If the question arose upon a marine policy of insurance, there would be no doubt I think that such a damage would be held within the terms, "danger or peril of the seas," though the open port if held to render the condition of those compartments unseaworthy, might prevent the policy from attaching at all. That circumstance, however, does not affect the scope of the phrase "danger of the seas"; and from the language of the opinion of Mr. Justice Gray in The G. R. Booth, I understand the supreme court to approve of the recent English decisions, holding, as respects that phrase, that in the absence of negligence there is no difference of construction to be given to those words themselves, whether they occur in a bill of lading or a policy of insurance; but that where the owner's negligence has made that danger operative, the exception of "danger of the seas," or "sea perils" in a bill of lading will not avail the owner, because he remains liable

for that negligence as the efficient cause, or causa causans, producing the loss. Hamilton v. Pandorf, 12 App. Cas. 518, 525, 528; The Xantho, Id. 510, 513, 514, 517; The Southgate [1893] Prob. Div. 329; The G. R. Booth, 171 U. S. 450, 459, 462, 19 Sup. Ct. 9, 43 L. Ed. 234; Liverpool & G. W. Steam Co. v. Phenix Ins. Co., 129 U. S. 397, 438, 9 Sup. Ct. 469, 32 L. Ed. 788; The Caledonia, 157 U. S. 124, 15 Sup. Ct. 537, 39 L. Ed. 644.

The officers' failure to close the port on the approach of bad weather through their ignorance that it was open and needed closing, may also be within the words "error" or "fault" in management. Those words are not synonymous. They signify different causes or circumstances of loss. Fault imports blame; error may arise from ignorance or mistake alone. Had the officers known, at any time before bad weather came on, that the port was open and needed closing, it would have been speedily closed. For a cargo port, it was favorably situated for access. It was but a few feet from the hatch and abreast of it. It extended only about two feet below the beams above, and was even with the top tier of boxes, which were of moderate size, the average of the tobacco cases in the bill of lading being less than six cubic feet each; so that a removal of a dozen of them, more or less, which would have been probably not more than 15 or 30 minutes work in pleasant weather, would have given access to the port. Mitchell testifies that an inside examination could have been made "by opening up a hatch and just clearing a little way from the hatch"; and the first officer says when the port was discovered open but was left as it was for the remaining two days of the voyage, that "if there had been the slightest indication of rough weather we should have broken cargo out (and) or secured it right away."

There were, therefore, such easy means for closing the port within a reasonable time when necessary on the voyage, that if the officers had known it was open, I should not have felt at liberty, under the ruling in The Silvia, to regard the compartments as being in an unseaworthy condition on sailing, nor should I so hold except for their lack of information as to this fact. In the leading case of Steel v. Steamship Co., 3 App. Cas. 72, the leaky cargo port was about two feet only above the water line and was covered up with grain in bulk, making access to it difficult; yet the case was sent back for a new trial that a jury might find whether this constituted unseaworthiness or not. As respects ease of access to the port, that case was very different from the present.

It was the general duty of the officers to keep all ports closed in rough weather. They did not close this one on the voyage, because they were ignorant that it had been wrongfully opened and that it needed closing again. The failure to close the port might be considered "error in management" through ignorance of its condition; just as running upon an unknown or uncharted reef would be error in navigation through ignorance, though not a fault. If the officers' ignorance was in part attributable to remissness in their watch of the ports during loading, as I think it was, the error would be blameable and a fault. In this respect the case is somewhat analogous to The Silvia,

171 U. S. 462, 19 Sup. Ct. 7, 43 L. Ed. 241. For in that case, though the officers knew that the iron shutter was open, they did not know, according to their testimony, that it needed closing. They all testified that closing it was not necessary, and ascribed the accident to wreckage. That iron shutter had not been closed for five years. Other similar shutters were not closed. It was about eight feet above the water line. The port had been deliberately adjusted and left as it was for the whole voyage. The shutter was deliberately left open and was not intended to be closed at all; and the only reason why it was not closed on the approach of bad weather was, that the officers did not know, or consider, that it needed to be closed. The supreme court held that it ought to have been closed; but that nevertheless the vessel was seaworthy on sailing as the port was easy of access and caused no present danger, and that the officers' failure to close it when it became necessary was "error or fault in management," without saying which; if their ignorance was not blameable, the failure to close the shutter must have been "error" only; if blameable, it was both error and fault. In that case the officers knew that the shutter was open; here they did not know that fact; and this, as stated below, is in my judgment an essential difference as respects seaworthiness of condition at the start. This, as I understand, was essentially the ground of the decision in Farr & Bailey Mfg. Co. v. International Nav. Co., 39 C. C. A. 197, 98 Fed. 636.

Some recent English decisions which are cited with apparent approval by the supreme court in The Silvia, giving a construction to the phrase "improper navigation," though having some pertinency here, seem to me too broad in construction to fit the phrases of the Harter act. I refer to the cases of Good v. Association, L. R. 6 C. P. 563 (leaving a sea-cock open); Carmichael v. Association, 19 Q. B. Div. 242 (a cargo port insufficiently fastened while loading); Canada Shipping Co. v. British Shipowners' Mut. Protection Ass'n, 23 Q. B. Div. 342. These cases hold that any navigation of a vessel when she is not in a fit condition to be navigated with safety to herself or her cargo, is "improper navigation," and that any damage from such navigation is damage "occasioned by improper navigation." It is claimed that this is the same thing as "fault or error in navigation" under section 3 of the Harter act.

To entitle the ship and owner, however, to exemption under the third section of the Harter act, it is not enough to show that some of the several causes therein named contributed to the loss. To exempt the shipowner, the statute requires that the damage must have "resulted" from one or more of those causes; and this requires that some one or more of those causes must have been the real, substantial or efficient cause of the loss. But if the causes of the loss are several, and one of them is negligence of the carrier not within section 3 and a sea peril has become operative and produced damage not by itself per se, but only in consequence of the carrier's negligence, which has made it operative, then the rule long applied as between ship and shipper in the construction of bills of lading (and the same rule must be applied here), is that the negligence, and not the sea peril, is to be

deemed the efficient and proximate cause of the loss. In Insurance Co. v. Sherwood, 14 How. 351, 364, 14 L. Ed. 452, 457, Mr. Justice Curtis observes:

"It is true that an expense, attached by the law maritime to the subject insured, solely as a consequence of a peril, may be considered as proximately caused by that peril. But where the expense is attached to the vessel insured, not solely in consequence of a peril, but in consequence of the misconduct of the servants of the assured, the peril per se is not the efficient cause of the loss, and cannot, in any just sense, be considered its proximate cause. In such a case the real cause is the negligence."

To the same effect are the citations from The Portsmouth, 9 Wall. 682, 684, 19 L. Ed. 754, and from other cases in The G. R. Booth, 171 U. S. 450, 19 Sup. Ct. 9, 43 L. Ed. 234. In such cases the damage does not properly "result" so much from the sea peril as from the negligence that has given opportunity for the operation of that peril; so that if the particular kind of negligence which is the substantial and efficient cause of the damage is not itself among the exempted causes named in the third section, the exemptions of that section do not apply. That section does, indeed, exempt from certain kinds of negligence, viz. from fault or negligence in navigation or management of the vessel, but not from any other kinds of negligence. It does not exempt from liability for negligence as respects unseaworthiness at the beginning of the voyage, or as respects the unfitness of cargo compartments for the goods stowed in them; so that whenever general or partial unseaworthiness of the vessel, or unfitness in the condition of particular cargo compartments, through negligence, must be deemed, under the rules of construction heretofore applied, to be the real, the substantial, the efficient, or the proximate cause of the loss, there is no exemption, unless this unfit condition, or the very negligence that causes it, arises in the course of the "management of the vessel" within the meaning of the act; and negligence as respects seaworthiness at the beginning of the voyage, is not of that kind, as held below. See The Frey, 92 Fed. 667, 669.

Whether an unfastened port on sailing renders a vessel unseaworthy or not, evidently depends on the situation of the port, its relation to the cargo or passengers, and the means provided for closing it on the voyage when necessary. If its situation is such that it is safe in moderate weather, and all the requisite means and conditions are provided for closing it on the voyage when necessary, the vessel is not unseaworthy; and if when closing it becomes necessary those means are not made use of, the case is one of neglect or error in management. Steel v. Steamship Co., 3 App. Cas. 72. But knowledge that a cargo port is open, is one of the indispensable requisites and conditions for securing the closing of it when necessary on the voyage. Without that information, all other provisions are useless; so that where no further inspection is expected or ordinarily required to be made, and no knowledge that the port is open can be expected to be acquired by the officers on the voyage, a port supposed to be closed but in fact open and blocked by cargo and not likely to be discovered to be open, must be considered unseaworthiness on sailing,

in so far as it is likely to imperil ship and cargo, though no further. Here the situation of the port was such that it was not in fact any menace to the accomplishment of this summer voyage, or to the safety of ship or cargo as a whole, i. e. to the safety of the adventure, but only to the particular cargo stowed in the midships of compartments 3 and 4. Although the ship as a whole, therefore, might not be deemed unseaworthy, and the insurance on ship and general cargo might not be affected by the open port, yet those compartments, as respects the cargo stowed in them, were not in a fit condition for the voyage when the vessel sailed, because in the absence of information to the officers that the port was open, the requisite and necessary provision for having it closed on the approach of bad weather, was not made. There was a defective or unfit condition of those compartments, as a lack of necessary cleanness or any other requisite to safe carriage would have been, constituting at least partial or limited unseaworthiness,—unseaworthiness quoad hoc, i. e. as respects the cargo stowed in those compartments only.

The obligation of the owner, however, as respects the cargo damaged, is precisely the same as if the defect constituted general unseaworthiness imperiling the whole adventure. If this unfit condition arose through negligence chargeable against the owner, i. e. through the negligence or misconduct of his own agents or servants as respects the seaworthy condition of compartments 3 and 4, the first clause of section 3 would exclude him from its benefits, since that requires due diligence to make the ship in all respects seaworthy; and inasmuch as the open port, left open through this negligence, chargeable against the owner, would also be deemed the real, efficient and true cause of the loss, although a sea peril or error in management was also a contributory cause, the case would also be excluded from the subsequent clauses of section 3, because the causes named in section 3 could not in that case be regarded as the real and substantial causes that produced the damage.

4. If the port was not originally closed at all, the negligence would be clear. Assuming, however, as I think most probable, that it was originally closed, the case, as I regard it, turns, therefore, upon the question whether such diligence was exercised in the watch upon the ports during loading as the circumstances reasonably required. In my judgment this is not shown. The burden of proof is upon the ship and owner. The Edwin I. Morrison, 153 U. S. 199, 14 Sup. Ct. 823, 38 L. Ed. 688. The testimony of the first, third and fourth officers shows that a watch upon the ports and the men was necessary and was intended to be maintained. Muirhead says that opening the ports by the workmen with a cargo hook in hot weather for ventilation was a frequent occurrence. Hatch testified that No. 4 was also the "special goods hatch," which it is said required more attention; while the heat and the suffocating dust of the grain from the lower hold, as Tribe describes it, and the objection of one of the men on this account to having the ports closed during loading, indicated the need of more special watch than usual. Under such circumstances reasonable care required at least some further notice or examination

of the ports before they were finally blocked up with boxes or other cargo. The compartments were lighted in the evening by electric lights, and such an examination would have been extremely easy and simple. The very fact that the officer on watch was occasionally absent from his post, giving opportunity for meddling, was an additional reason for examination just before the ports were finally blocked up. The fact that the lugs of this port were found hanging down, shows that no attention was given to the ports after they were first closed, since the most cursory notice of them would have discovered that fact. My conclusion is that the port was open on sailing in consequence of insufficient care during loading, and that the open port, and the negligent watch by which it was suffered to remain open until it was blocked up with cargo, and until the hatches were closed and the vessel sailed, must be held, as between ship and shipper, to be the real, substantial and efficient cause of the damage, for which ship and owner are therefore liable.

5. The same negligence has a direct and important relation also to the first section of the Harter act, and to the owner's liability therein recognized and emphasized, "for any failure in the proper loading, stowage, custody, or care * * * of any and all lawful merchandise."

The insertion of stipulations in bills of lading seeking to exempt the ship and owners from liability of this description, is by section 1 forbidden; and if inserted, they are by section 2 declared void. There is no question that before the passage of the Harter act the ship and owner, except for some such stipulations, would be liable by the general law maritime for all such losses as the present, not merely from the point of view of the lack of seaworthy condition of the compartments, but also as respects the proper stowage, care, and custody of the goods. It is plainly not proper stowage and care of goods, but extremely improper stowage and a great want of care, to put them in a compartment where they are liable to be damaged by the inroad of the seas through an unfastened port, without full information to the officers of the condition of the port, and of the necessity of closing it on the voyage in time to avoid damage. Nor is it proper "care" of goods already stowed in a compartment, to allow the goods to be imperiled through a reopening of the ports during loading, whether by stevedores or thieves, through an insufficient watch against this known liability. This would never be allowed knowingly; and when it happens through remissness in the watch, it becomes negligence in the stowage and care of the goods. There is nothing in the Harter act that in the least diminishes the shipowner's previous obligations in this regard. As respects goods stowed before as well as after the port was wrongfully opened, if it was originally fastened, there was, therefore, a "failure in the proper stowage and care of the goods," within the first section.

The circumstances in the case of The Carron Park (15 Prob. Div. 203) were somewhat different, so that that case does not apply. It has also been held that the specific requirements of section 1 as respects the care, custody and delivery of cargo, prevail over the more

general provisions of section 3 in case of conflict between them. The Glenochil [1896] Prob. Div. 10, 15; Worsted Mills v. Knott (D. C.) 76 Fed. 582, 584; The Colima (D. C.) 82 Fed. 665, 668; The Whitlieburn (D. C.) 89 Fed. 526, 528.

6. It is urged, however, that the care of the ports in immediate preparation for sailing, is so peculiarly a duty of the officers of the ship that the term "management of the ship" should be held to include this duty, and not be restricted to the period of actual navigation. I recognize the force of this argument and its analogy to the case of The Glenochil [1896] Prob. Div. 10; The Rotherfield, 8 Int. Rev. Dr. Mar. 102, 104. But howsoever this view may be applied to other species of negligence or management, it cannot be applied to negligence as respects any of the elements of seaworthiness or of seaworthy conditions on sailing. For in so far as the closing of the ports, or any other acts of management, are necessary to seaworthiness, either general or partial, or to the fitness of cargo compartments at the time of sailing, the owner, by the express provision of the first clause of section 3, is made answerable for due diligence in all those particulars. Due diligence "to make the ship in all respects seaworthy" includes diligence to secure the fitness of all cargo compartments, and every other element of initial seaworthiness. The owner is himself thus made answerable for due diligence in respect to that duty by the first clause of section 3 as a preliminary condition of any application of the subsequent provisions of the third section; so that a failure in that regard by any of the owner's agents or servants, whether officers, crew or other persons, is legally attributable to the owner (The Flamborough [D. C.] 69 Fed. 470; The Niagara [D. C.] 77 Fed. 329, 334; The Colima [D. C.] 82 Fed. 665, 678; The Frey, 92 Fed. 667; Dobell v. Steamship Rossmore Co. [1895] 2 Q. B. Div. 414, 417), and this failure by the terms of the first clause excludes him from the benefits of the subsequent provisions of that section. Nor does the provision of the bill of lading that the enumerated exceptions and conditions shall "apply during loading" in this case extend the shipowner's exemption in this regard; since there is no other exception enumerated in the bill of lading that touches negligence of this kind, except that which adopts the Harter act itself, and this by its own terms excludes all cases of loss resulting from negligence in regard to seaworthy conditions.

Decree for the libelant against the Manitoba with costs, and for the dismissal of the libel as against the stevedores without costs.