## NORD–DEUTSCHER LLOYD v. PRESIDENT, ETC., OF INSURANCE CO. OF NORTH AMERICA.

(Circuit Court of Appeals, Fourth Circuit. July 6, 1901.)

### No. 408.

1. SHIPPING—LOSS OF CARGO—UNSEAWORTHINESS OF LIGHTER.

A lighter, so constructed that the presence of any water in the hold rendered it unstable when loaded, which overturned shortly after being loaded, when the weather was clear, the wind light, and the water smooth except from a slight swell caused by a passing steamer, by reason of water entering her hold through seams which were insufficiently calked, must be held unseaworthy when loaded.

2. SAME—DUE DILIGENCE—HARTER ACT.

Due diligence to make a vessel seaworthy at the commencement of her voyage, which will entitle the carrier to the exemptions given by section 3 of the Harter act, must be exercised in the work itself, and not merely in the selection of agents to do the work, and must be adequate to accomplish the result intended, except as to latent defects not discoverable by the utmost diligence. Due diligence was not exercised to make a lighter seaworthy and fit for the business in which it was employed, where the seams were so improperly calked that they opened and admitted water into the hold when the boat was rocked by a slight swell from a passing steamer; the defect being one which could have been discovered by examination.

3. SAME—ACTION FOR LOSS OF CARGO—RIGHT OF INSURER TO MAINTAIN.

Where a marine insurer recognizes the validity of an oral agreement with the holder of an open policy that it should be held to cover all grain shipped by the insured, whether reported before or after loading, and pays a loss arising from the sinking of a lighter employed by a ship in loading grain of the insured, it is subrogated to the shipper's right of action against the carrier to recover for the loss, and it is no defense to such action that it had not been notified of the risk nor received the premium therefor at the time of the loss, and might have successfully resisted payment under the terms of its policy.

Appeal from the District Court of the United States for the District of Maryland.

Parr & Son, merchants in Baltimore, arranged with Schumacher & Co., agents of the Nord-Deutscher Lloyd, a steamship company organized under the laws of the empire of Germany, for the carriage of 6,000 quarters of corn from Baltimore to Bremen, and it was verbally agreed that the steamship company would transport said corn for a certain freight, from port to port, subject, in all respects, to the terms and conditions of the

bill of lading, which had theretofore been adopted and was then in use between the steamship company and the grain shippers of Baltimore. By the custom of the port grain was loaded into ships either at the elevator, or transported from the elevator to the wharves, where ships might lie, in lighters, at the expense of the ships. This grain was delivered at the Canton elevator to lighters selected by the steamship company, and at its expense, to be carried across the bay to the steamship H. H. Meier. 6,148 bushels of corn, of the value of $2,290.47, was delivered on the morning of July 29th, and loaded upon lighter No. 154, and the testimony shows that it was properly loaded. The lighter, with others of the same class, was to have been towed across the bay by a tug. While awaiting the loading of the other lighters, and in being pulled away from the pier, the lines slipped off the bitts, and the lighter drifted out into the stream some 200 or 300 feet from the end of the pier, at which point it began to rock, and the lighterman aboard testified that he grabbed his shovel and tried to trim it, but could not get it up. He then grabbed his pump, and commenced pumping. About this time the captain of one of the company's tugs, seeing that there was some trouble, went to the assistance of the lighter, jumped aboard, and looked down the hold, saying that there was no use to pump, that it had sprung a leak, and water was pouring in, and told the lighterman to get off, shortly after which the lighter turned over and sank. The captain of the tug Walter, owned by the same company which owned the lighter, testified that when he first saw it "she was taking a kind of roll"; that he went aboard, saw that it had a great deal of water in it and was listing, and the grain was piled up against the side of the house, and that it was too far gone for him to do anything to save it. There was testimony that the steamship Louise, a side-wheel excursion steamer, had passed near the end of the dock, and had gone to a pier just below, shortly before the disaster, though many witnesses who were in position to see had not noticed her, and the men aboard the lighter testified that the "wobbling" of the lighter had been caused by the swell from the passing steamer. It is probable that there was some swell, but it is not likely to have been very considerable; for the steamer must have passed this point at a slow rate of speed, as she entered a dock but one below the elevator, and the most credible witness testified that she was lying at the dock when the lighter turned over. It was a bright summer day, and there was but a light wind. The finding of the court below, which is fully sustained by the testimony, is that this disaster was not caused by "any unusual occurrence, or anything that could in any sense be called a danger of the sea, and the result follows that it must have happened either because the lighter was unfit for the duty undertaken to be performed by it, or was leaking while she was at the elevator wharf, or had such a defect in her that the slight roll caused by the swell brought some defective portion of her under the water, and the water leaked in through the defect. There is no other explanation that suggests itself as possible. The ordinary swell from a passing steamboat is one of the most common things that lighters in the harbor have to encounter, and certainly a lighter which was not sufficient to withstand for a few minutes such a swell as was created on this morning, judging from the testimony of all witnesses as to its extent, was unfit, for some reason or other, to perform the service of taking a load of corn across the harbor."

The lighter was 72 ft. 6 in. long, 22 ft. 6 in. wide, and 6 ft. 6 in. deep. Unloaded, it would draw about 14 or 15 inches of water; when fully loaded, it would have about 18 inches free board. There was a house built on it, with hatches, into which the grain was run, all of the grain being on the main deck, and a shallow hold underneath, in which no cargo was carried. It was flat-bottomed, and in construction similar to the scows and lighters which were in common use in the harbor of Baltimore. It was built in 1893, and, the testimony shows, had been kept in good order; had been injured in November, 1898, by being crushed against a pier in a gale of wind, and was then thoroughly repaired; and, the testimony shows, had been inspected in May, 1899, by a marine superintendent of one of the largest ship merchants and brokers, and also by an inspector of under-

writers and another marine surveyor. They testified that it was in good, sound condition, and fit for the traffic for which it was used. These witnesses did not testify that they had made a critical examination of her calking. The general manager of the lighterage company testified that when it was repaired, in May, 1899, it was not calked. Several experts who were examined testified that in lighters of this description any water in the hold would tend to make them unstable; that a slight list would cause the water to flow to one side, and give a cant, and with a deck cargo of grain in bulk this tendency would naturally be aggravated. Their opinion was that the overturning was due to water in the hold. The men in the lighter testified that they examined the hold before it left the dock, and that there was no water in it. All of the testimony shows that water was pouring in just below the fender streak, after it began to rock, while out in the stream. After this disaster it was repaired by the Spedden Marine Railway Company, and their bill for repairs, amounting to $200, is in evidence, from which it appears that the greater part of this bill was for calking. Parr & Son testified that this corn was insured under an open policy with the Insurance Company of North America, and that by agreement of said company, both verbally and in writing, all grain shipped by them in vessels loading either general cargoes or full grain cargoes was insured by that company, whether the same was reported before commencing to load or after finishing. The original policy of insurance was dated in 1877, and the same had been mislaid, but what purported to be a copy of it was in evidence, and the letter of the manager and general agent of the insurance company, containing the agreement above set forth, was offered in evidence. They presented a bill for the loss to the insurance company, and received payment therefor, giving a written receipt and a subrogation of the rights of insured. The decree was entered in the court below in favor of the insurance company for the full amount claimed.

The appellant claims exemption from liability under the following clauses in the bill of lading: "It is mutually agreed that the carrier shall have liberty to convey goods in lighters to and from the ship, and to discharge into lighters, at the risk of the owners of the goods." "It is also mutually agreed that this shipment is subject to all terms and provisions of, and all exemptions from liability contained in, act of congress of United States approved Feb. 13, 1893." 27 Stat. 445. "It is also mutually agreed that the ship is warranted seaworthy only to the extent that the owners shall exercise due diligence to make it so." All of these defenses were presented in the court below, which, in a well-considered opinion (106 Fed. 973), overruled the same. The appellant also relies upon the ground that the insurance company has no standing in court, as it claims that the testimony failed to show that the corn was insured, and the payment of the money by the insurance company was a mere purchase of the claim, which, under the law of the state of its creation, it had no right to make. This defense was also presented in the court below, but evidently was not considered of much merit, as the opinion fails to notice it.

A. H. Taylor and John P. Bruns (E. P. Keech, Jr., on the brief), for appellants.

Arthur D. Foster and Francis S. Laws, for appellee.

Before SIMONTON, Circuit Judge, and BRAWLEY and BOYD, District Judges.

BRAWLEY, District Judge, after stating the case, delivered the opinion of the court.

The case will be considered as if the corn had been delivered to the ship from the time it was placed on board the lighter, and that the carrier is entitled to all benefits, and is subject to all requirements, of the contract, as stipulated in the bill of lading, although the appellee

contends that, under the facts presented, the corn not having reached the steamship H. H. Meier, the appellant is held to that high degree of diligence for custody, care, and proper delivery which is imposed by section 1 of the Harter act, that forbids any agreement whereby he may be relieved from liability for loss or damage arising from negligence, fault, or failure. The appellee also contends that the stipulation in the bill of lading that "the carrier shall have liberty to convey goods in lighters to and from the ship, and to discharge into lighters at the risk of the owners of the goods," is severable, and that the latter clause applies only to the port of Bremen, where the discharge was to have been made, and where the testimony shows it was the custom to discharge into lighters at the port of Bremerhaven on account of the light draft of water, and inability of the ship to proceed directly to Bremen. It is unnecessary to determine these points, because, looking at the case from the point of view most favorable to the appellant, we cannot see how it can escape liability; for it cannot be claimed that the obligation to provide a seaworthy lighter is any less than the duty to provide a seaworthy ship. Prior to the Harter act, the duty of shipowners to provide seaworthy vessels was absolute and unqualified. Their warranty "did not depend on their knowledge or ignorance, their care or negligence." There is an obvious distinction between the duty of providing a seaworthy vessel which is subject to the inspection of the owner before she starts on a voyage, and the duty of navigation, which must necessarily be left to the discretion of agents at sea and in foreign ports. Hence grew up the custom which allowed shipowners, by express agreement, to exonerate themselves from liability for the negligence of their agents, by inserting in bills of lading such clauses of exemption, the validity of which was sustained in courts of Great Britain, France, and Germany and in some of the states of this country; but, after long contention, the supreme court of the United States held that it was against public policy to allow carriers to exonerate themselves from liability for the negligence of their agents. Such was the state of the law at the time of the passage of the Harter act, the main purpose of which was to relieve American shipowners of the disadvantage suffered in competition with foreign shipowners, who could, by contract, exempt themselves from liability for the negligence of their agents and employés. It was within the competence of congress to remove this disadvantage and to make a change in the standard of duty. The bill now known as the "Harter Act" was introduced in the house of representatives, and, as it passed that body, made no change in the obligations imposed by then existing law, that the vessel should be in all respects seaworthy. As amended in the senate and passed into law, if the owner shall "exercise due diligence to make the said vessel in all respects seaworthy," etc., he is relieved of responsibility for damage or loss resulting from faults or errors in navigation and in the management of said vessel. As it now stands, the law permits the owner to relieve himself from the rigidity of the warranty of seaworthiness, but there is nothing which lessens his obligation to exercise due diligence in all respects at the inception of the voyage.

One of the earliest cases in the supreme court of the United States, wherein the question of seaworthiness is considered in connection with the Harter act, is The Carib Prince, 170 U. S. 655, 18 Sup. Ct. 753, 42 L. Ed. 1181. In this case, which was first heard in the district court (63 Fed. 266), it appears that the vessel was a new British steamship, built by builders of the highest class, and the bill of lading, signed in a port governed by English laws, exonerated the ship from liability for injuries arising from latent defects in hull, tackle, boilers, and machinery. The damage was due to a latent defect in a rivet, arising from the fact that the quality of the iron had been injured by too much hammering at the time it was annealed. After the construction the tank had been tested by hammer and by water pressure, and it was found to be tight, and strong enough to sustain the weight of water when not in motion, but when in motion the rivet proved insufficient, and gave way, causing the damage sued for. No external examination would have discovered the defect. The court below held that the damage arose from a latent defect within the exception in the bill of lading, and the libel was dismissed. When the case went to the circuit court of appeals the effect of the Harter act was considered by Judge Shipman, who delivered the opinion, and affirmed the decree of the court below. In the supreme court the decrees of the lower courts were reversed; Justice White, who delivered the opinion, holding that the exceptions in the bill of lading exempting the shipowner from loss or damage from latent defects did not operate to relieve him from damages caused by a state of unseaworthiness existing at the inception of the voyage and at the time the bill of lading was signed, and that that had been settled by the decision in The Caledonia, 150 U. S. 124, 15 Sup. Ct. 537, 39 L. Ed. 644, which held that the clause in question operated prospectively only, and did not relate to the condition of seaworthiness existing at the commencement of a voyage. The principle upon which that ruling rested, said he, "was that clauses exempting the owner from a general obligation of furnishing a seaworthy vessel must be confined within strict limits, and were not to be extended by latitudinarian construction or forced implication, so as to comprehend a state of unseaworthiness, whether patent or latent, existing at the commencement of a voyage."

In The Silvia, 171 U. S. 463, 19 Sup. Ct. 7, 43 L. Ed. 241, the damage was from water which came through one of the portholes. When she began her voyage, the weather being fair, the glass covers only were shut, the iron ones being left open for the purpose of lighting the compartment. The iron shutters could easily be got at and closed when occasion required, but it appears that shortly after sailing the ship encountered heavy weather, and the glass cover of one of the ports was broken. The court held that the owners were entitled to the benefits of the third section of the Harter act, because the neglect to close the iron covers of the ports was a fault or error in the management of the ship; that the owners had not only exercised due diligence to make her seaworthy, but that she was actually seaworthy when she began her voyage. Justice Gray, who delivered the opinion, uses this language: "It was adjudged by this court at

the last term that the act of congress of February 13, 1893, known as the 'Harter Act,' has not relieved the owners of the ship from the duty of making her seaworthy at the beginning of her voyage,"— citing The Carib Prince, supra.

In The Indiana, 39 C. C. A. 197, 98 Fed. 637, the damage to the cargo was also from water coming through the portholes, the port being only 2 or 3 feet above the water line. The facts, though similar to those in The Silvia, are not precisely the same, and the court of appeals held that the ship was unseaworthy, and therefore liable for the damages claimed. Upon appeal to the supreme court of the United States (not yet officially reported) 21 Sup. Ct. 591, this decree was affirmed, and the court uses this language:

"If the unseaworthiness is not a result of error or fault in management, the third section does not apply; and, even if it were, the exemption still cannot obtain, unless it appears the owner used due diligence to make the vessel seaworthy. And it is said that the owner does exercise such diligence by providing a vessel properly constructed and equipped, and, while he is responsible for the misuse or nonuse of the structure or equipment by his shore agents, he exercises due diligence by a selection of competent sea agents, and that he is not responsible for the action of the latter, although they produce unseaworthiness before the commencement of a voyage. We cannot accede to a view which so completely destroys the general rule that seaworthiness at the commencement of a voyage is a condition precedent, and that fault in management is no defense when there is lack of due diligence before the vessel breaks ground. We do not think the shipowner exercises due diligence, within the meaning of the act, by merely furnishing proper structure and equipment; that the diligence required is diligence to make the ship in all respects seaworthy, and that, in our judgment, means due diligence on the part of all the owner's servants in the use of the equipment before the commencement of the voyage and until it is actually commenced."

The Irrawaddy, 171 U. S. 192, 18 Sup. Ct. 831, 43 L. Ed. 130, did not turn upon the question of seaworthiness, but this expression from the opinion of Justice Shiras doubtless expresses the view of the supreme court as to the general purposes of the Harter act:

"Plainly, the main purposes of the act were to relieve the shipowner from liability for latent defects not discoverable by the utmost care and diligence, and, in event that he has exercised due diligence to make his vessel seaworthy, it exempts him and the ship from responsibility for damage or loss resulting from faults or errors in navigation or management."

And, so far as we can gather from the few cases which have been before that tribunal wherein the question of seaworthiness was the main question involved, we do not find that the rule requiring the highest degree of care in providing a seaworthy vessel has been relaxed. The ship must be really fit to undergo the perils of the sea and other incidental risks to which she may be exposed. The obligation of due diligence to make the ship seaworthy is in all respects the same as before the Harter act, which does not establish any new rule of diligence. The shipowner cannot now, any more than before, rely upon external appearances in place of known tests, nor can the mere selection of competent persons to inspect satisfy the requirement of due diligence. Proper repairs, equipment, and inspection must be exercised in fact.

In The Phœnicia (D. C.) 90 Fed. 117, the damage was due to a

leak in one of the ordinary ports on the starboard side a little above the water line. In the bill of lading it was provided that the owner should not be liable for any latent defect, nor for any accident of navigation occasioned by any negligence or fault of any of the servants of the ship. Being a German ship, these stipulations were valid under the German law. Judge Brown held that the evidence did not show the actual cause of the leak with requisite or reasonable certainty. The brass ring that held the window of the port did not close tightly in the rubber bed against which it shut. She was a new steamship, on her first voyage, and great pains had been taken to make her in every respect a first-class ship. Whether this frame had been sprung by contact with the stone gateways at Havre, or arose from sea peril, or was due to a misfitting blind, was not clear. It being shown that the only inspection and test applied at Hamburg was to try the outer blind to see if it would go in and out, and screw up tight against the glass door and inner cover, and inasmuch as other tests, such as the water test and chalk test, if applied, would have disclosed whether or not the defect existed before the ship sailed, it was held that the burden of proof was upon the ship to show that the faulty conditions of the port, and consequent leak, arose on the voyage; citing The Edwin I. Morrison, 153 U. S. 199, 14 Sup. Ct. 823, 38 L. Ed. 688, where the Chief Justice, delivering the opinion, repeatedly states that it is for the owners to show affirmatively the safety and sufficiency of the ship's condition when she sails, by making all ordinary and reasonable tests. If the determination of the question of the ship's sufficiency is left in doubt, that doubt must be resolved against the owners; the burden is upon them.

In The Alvena, 25 C. C. A. 261, 79 Fed. 974, a cargo of sugar was damaged by water coming through the bottom of the ship. This hole was caused by the corrosive action of the sugar drainage upon the iron plate of the steamer. This corrosive action being well known, iron steamers intending to carry sugar cargoes ought to have, as the Alvena had in this case, a layer of Portland cement covering the entire bottom where the sugar is expected to be stored, which layer of cement should be kept solid and free from cracks. The accepted explanation was that through some crack in the cement the sugar drainage had worked down so as to corrode the plate beneath. The bill of lading stipulated against any liability, loss, or unseaworthiness of the ship, provided all reasonable means had been taken to make her seaworthy. The sugar acid had eaten out a small hole about five inches in length by about three in breadth, and, except in that small space, was found to be in good condition. It was contended in behalf of the ship that the cement had been broken by some blow upon the outside. The court held that that rested upon conjecture only, without such evidence of actual facts as was necessary to sustain it, and that did not dispense with proof of such inspection of the ship before commencement of the voyage as the nature of the case admitted and required. The proof of inspection of the cement bottom before the commencement of the voyage was only of a general character. Full inspection was not impracticable, but inconvenient, in that part of the ship. It was therefore decided that the acci-

dent arose from a lack of necessary repair at the time the crack occurred or of the requisite inspection afterwards. "For such fault the Harter act, even upon the broadest construction of it, affords no exemption of liability, even though the corrosive action of sugar drainage was one of its 'inherent qualities.' The ship was bound to the exercise of due diligence before the commencement of the voyage to prevent the access of drainage to the iron plates." The decree of the district judge held the ship liable for the damage, and was sustained by the circuit court of appeals.

Lighters, fit for the business in which they are employed, ought to have sufficient seaworthy stability to stand up, except under extraordinary circumstances. The weight of the evidence does not indicate any phenomenal cause for the capsizing. The weather was clear, the wind light, and the water smooth, except from a slight swell caused by a passing steamer, such as was to be expected always in the harbor. The testimony shows that the lighter was of construction such as was ordinarily in use in Baltimore, but it cannot be claimed that any custom could validate the use of an unstable lighter. We are bound to conclude that the lighter was unseaworthy, and the only question that remains is whether due diligence was used to make her seaworthy. By the third section of the Harter act, and by the special stipulation in the bill of lading that the ship was "warranted seaworthy to the extent that the owner shall exercise due diligence to make her so," the shipowner is relieved from the warranty of absolute seaworthiness to which he was bound prior to the Harter act. The difference is important because it relieves the shipowner from responsibility for latent and undiscoverable defects, but the warranty of diligence remains. "Diligence" and "negligence" are relative terms, and depend on varying circumstances. Due diligence requires such watchful caution and foresight as the circumstances of the particular service demand. It must be adequate to the occasion. It must be due diligence in the work itself, and not merely in the selection of agents to do the work; otherwise, shipowners might escape all responsibility merely by selecting agents of good reputation, and would be relieved whether such agents exercised due care or not to make their vessel seaworthy, and any responsibility would be frittered away. We do not believe such was the intention of the act, and while it is in the power of congress to make a new standard of duty in this regard, and the courts ought to conform their decisions to a standard thus made, we are of opinion that the Harter act was not intended to relieve shipowners of responsibility for the furnishing of seaworthy ships, but was intended to provide that if they did furnish seaworthy ships they should then be relieved of responsibility for errors and faults of management when the ships were at sea, and beyond the eye and control of their owners. No construction should be given to the act which would relieve them of the duty of that vigilant anxiety and solicitude which is required to make their vessels seaworthy. Due diligence on the part of the owner to make the vessel seaworthy is a preliminary condition to the relief from faults or errors in management which are provided in section 3, and any failure of duty in that regard by any of the owner's agents or

servants must be legally attributed to him. The testimony in the case makes it reasonably certain that the rocking of the lighter caused it to leak, and that water poured in through seams below the deck. The master of the tug, who went aboard of it, testified that the water was pouring in underneath the fender streaks. The testimony also shows that, when repairs were made in the May preceding the disaster, the lighter was not calked; and the bill for repairs, made within two weeks after she was sunk and lifted, shows that the greater part of the bill for repairs was for calking. The experts testified that in lighters of this construction any water in the hold would render them unstable. This was so obvious that such testimony was hardly needed.

It is contended by the appellant that, inasmuch as the lighter was allowed to get adrift by reason of negligence in allowing the lines to slip off the bitts, that was a fault or error in navigation which relieves the owner for losses arising from "dangers of the sea or other navigable waters," under the third section of the Harter act. That the lighter might have been saved from disaster, if in tow of the tug, is a matter of conjecture, supported by some testimony; but the phrase "dangers of the sea" has a settled meaning, and cannot be held to include a danger caused by a slight swell in the harbor caused by passing steamers, which was one of the ordinary occurrences in such waters, nor can it include a danger which would have been avoided or escaped if due diligence had been used in providing a seaworthy vessel. It is obvious that the lighter was not properly calked, and, if due diligence had been exercised in examining it, that defect would have been discovered. The slight rocking caused the seams to open, and the water pouring into the hold rendered it unstable. Our examination of numerous cases has not enabled us to find one where leaking from such a cause has been held to be a latent and undiscoverable defect, and we are bound, therefore, to conclude that the appellant did not exercise due diligence in making its vessel seaworthy, and therefore has not brought itself within the terms of the Harter act, or of the special clause of its bill of lading which relieves it of liability.

The other ground of defense is that no policy of insurance upon this grain was ever issued, no premium paid before the loss, and therefore that the insurance company was a mere volunteer, and that the purchase of the claim was ultra vires. Parr & Son had an open policy of insurance dated February 28, 1877 (No. 144,835). The original policy had been lost, but what purports to have been a copy was in evidence. The letter from the manager of the insurance company was also in evidence, wherein, confirming a conversation with one of the firm, he says: "I beg to say that all grain being shipped by you in vessels loading either general cargoes or full grain cargoes is insured in the Insurance Company of North America, whether reported to me before commencing to load or after finishing." Undoubtedly Parr & Son believed that the grain was insured, and, under the arrangement with the manager and agent of the insurance company, the company believed that this grain was covered by the open policy. Experience does not show that insurance companies

are swift to acknowledge obligations that are without legal foundation, and it is not to be lightly assumed that it would have paid the claim if it did not feel itself bound to do so.   The claim for loss was presented to the insurance company, which paid the same, and took an assignment of the rights of the insured.   Preliminary arrangements as to the amount and conditions of insurance are necessarily, in nearly all cases, made by agents, and such agents are, as the court says in Insurance Co. v. Colt, 20 Wall. 560, 22 L. Ed. 423, "by general usage authorized to allow credit for the premium; its allowance does not impair the validity of the preliminary contract to insure."   Whether the premium was actually paid before the loss is immaterial if, under arrangement with the agents and the general course of business, the formal document was to be issued and premium paid after the corn was aboard ship and reported.   That there was such understanding and custom the testimony abundantly established, and a contract of this nature could have been enforced in a court of equity against the company.   The ground upon which an insurance company is entitled to be subrogated to the rights of the assured is thus stated in Wager v. Insurance Co., 150 U. S. 99, 14 Sup. Ct. 55, 37 L. Ed. 1013:

"It is too well settled by the authorities to admit of question that as between the common carrier of goods and an underwriter upon them the liability to the owner for their loss or destruction is primarily upon the carrier, while the liability of the insurer is only secondary. The contract of the carrier may not be first in order of time, but it is first and principal in ultimate liability. In respect to the ownership of the goods and the will incident thereto the owner and the insurer are considered but one person, having together the beneficial right to the indemnity due from the carrier for a breach of his contract or for nonperformance of his legal duty. Standing thus, as the insurer does, practically in the position of a surety stipulating that the goods shall not be lost or injured in consequence of the peril insured against, whenever he has indemnified the owner for the loss he is entitled to all the means of indemnity which the satisfied owner held against the party primarily liable. His right rests upon the familiar principles of equity."

The case does not require us to go into possible defenses that the insurance company might have made.   It cannot be material to the carrier with whom it litigates the question of negligence.   In Sun Mut. Ins. Co. v. Mississippi Val. Transp. Co. (C. C.) 17 Fed. 919, the court said:

"I hold that, since the insurance company in this case saw fit to waive the objection and treat the loss as within the policy by paying it, the carrier cannot be heard to object, for the reason that its liability to the shipper is clear, and it is in no wise injured by being called upon to make payment to the insurer. Such was the conclusion reached by Woods, circuit judge, in Insurance Co. v. The C. D., Jr., 1 Woods, 72, Fed. Cas. No. 7,051, and the doctrine seems to be entirely consonant with justice and equity. It would be contrary to the spirit of admiralty law, which proceeds upon the principles of the broadest equity, to permit the carrier, who is shown to be clearly liable to the shipper, to avail himself of all the defenses which might have been interposed by the insurance company, if sued in an action at law upon the policy."

In the case cited from 1 Woods, Woods, circuit judge, said:

"Respondents further claim that having shown by the testimony, as they allege, that the insurance company was not legally bound to indemnify the

insured for the loss the latter sustained by the collision, therefore the libelants have no cause of action against the respondents, although they have paid the loss; but I am of opinion that the authorities are adverse to this claim, and adopt the conclusion of the district judge, and refer to the case of The Monticello v. Mollison, 17 How. 152, 15 L. Ed. 68."

Numerous cases might be cited to show the power of agents of insurance companies to bind their companies by oral contracts to waive payment of premiums and other conditions and forfeitures. Those questions do not arise. The insurance company, having acknowledged its obligation and paid the claim, is subrogated to all rights of the insured. The Sidney (D. C.) 23 Fed. 89; Pearse v. Steamship Co. (D. C.) 24 Fed. 285. The decree of the district court is affirmed.