KELLY, WEBER & CO., Limited, v. FRANKLIN FIRE INS. CO.

No. 18330.

District Court, E. D. Louisiana.
Sept. 26, 1930.

Montgomery & Montgomery, of New Orleans, La. (Richard B. Montgomery, Jr., of New Orleans, La.), for libelant.

J. C. Hollingsworth, of New Orleans, La., for respondent.

BORAH, District Judge.

This is an action to recover on a contract of marine insurance against the Franklin Fire Insurance Company for the loss and damage to a cargo of acid phosphate fertilizer which was shipped on the steamship Redman. The libelant alleges that this damage was caused by perils of the sea and that such loss is covered by the policy of insurance issued by the respondent.

The cargo in question was shipped to the libelant by the Standard Wholesale Phosphate & Acid Works of Baltimore, Md. The shipper chartered the full cargo space of the steamship Redman, furnished the labor, and loaded about 5,000 long tons of acid phosphate fertilizer on board. The fertilizer was packed in jute or burlap bags, each containing 200 pounds of 16 per cent. or more acid phosphate, and same was laden in the bottom of the vessel and against the skin of the ship and piled up one above another in tiers at least 20 feet high. The cargo was received on board in apparent good order and was shipped under a bill of lading which bears the notation across its face, "Shippers load and count all on board to be delivered," and

same was covered under a policy of insurance which the shipper had previously taken out for the benefit of the libelant insuring this cargo against perils of the sea.

When about seventy miles out from Baltimore, the Redman during a heavy fog went hard and fast aground on an uncharted mud flat in Chesapeake Bay. In my opinion this was an extraordinary occurrence and must be understood to be one of the "perils of the seas" referred to in the policy. Hazard v. New England Marine Insurance Co., 8 Pet. 557, 584, 8 L. Ed. 1043. Because of the grounding it was necessary to lighter the vessel; accordingly, after assistance had been procured from Baltimore, 400 tons of the fertilizer, constituting the topmost tiers of the upper stowage, was taken out of the No. 1 hold of the vessel and loaded into a covered lighter. To further lighten the vessel, 130 tons of the ship's water was jettisoned from her ballast tank forward, and thus buoyed up the Redman was able to extricate herself with the assistance of two tugs and a revenue cutter. After she came off into deep water the cargo was reloaded on the ship. Into the same No. 1 hold was placed 270 tons of the fertilizer that had been removed to the lighter and the remaining 130 tons was laden in the bridge deck, No. 3 hatch, separate from the other cargo. During the lightering the sea was rough and it rained intermittently; however, the weather was not extraordinary and operations were not carried on during the rain, and while spray undoubtedly did reach some of the outside bags in the slings, it is apparent that no damage resulted therefrom.

The Redman then put into Newport News for a survey to determine whether she was in a safe and fit condition to proceed with her voyage. The surveyor to Lloyd's Registry of Shipping found no apparent defect in the vessel's machinery, no evidence of water or sign of any leakage, and she was issued a certificate recommending that she be continued in Class 100–A–1. With this assurance of safety she proceeded on to New Orleans, at which port she finally arrived after having been delayed about five days as a result of the grounding. There she was met by representatives of libelant and a marine surveyor on cargo who witnessed the cargo being unloaded. The bags that were removed from the bridge deck were found to be in good condition and their contents apparently sound; those from the forward part of the vessel that had been discharged to the lighter in Chesapeake Bay were in like condition, and though a few of the bags showed some

evidence of water contact, the contents did not appear in any way to be affected. Undoubtedly a few of the bags were torn, but this presented no unusual condition, and the evidence clearly justifies the conclusion that all of the bags which were removed from the bridge deck and all of the top stowage from the different holds and compartments of the vessel were all of the same general condition on the out-turn.

However, a different situation developed after the stevedores reached the lower stowage of the vessel; there they found the bags of acid phosphate flattened and caked and wedged into one another. This condition was more or less general and was not confined to any particular hold or compartment of the vessel, and this fact is clearly established by the testimony of cargo examiner McKee and by libelant's witnesses, Jameson and Vincent. Because of this condition it was necessary in unloading the cargo to use shovels and crowbars to pry the bags apart; as a result, a number of bags were split and torn, and in consequence the cargo was discharged at great additional expense. It is for this additional expense that a recovery is here sought, it being conceded that there was no damage to the fertilizer itself and that this claim is limited to the additional cost of unloading and resacking the fertilizer and to a comparatively small amount claimed short in delivery weight.

The burden of proof in this action is upon the libelant to show that the loss occurred by perils of the sea, and that it has in all respects duly complied with the terms and conditions of the policy. Swan v. Union Insurance Co., 3 Wheat. 168, 4 L. Ed. 361; Richelieu & O. Nav. Co. v. Boston Ins. Co., 136 U. S. 408, 10 S. Ct. 934, 34 L. Ed. 398.

The respondent by its answer denies that the loss resulted by reason of a peril of the sea, as alleged by the libelant, and further denies that the loss is one covered by the policy of insurance, and there might well have stopped. In addition, however, it has pleaded two separate defenses in amplification of what was in effect its general denial of liability, and in doing so it has not caused the burden of proof to shift to it and relieved the libelant of its burden of proving that the loss was occasioned by a peril of the sea and that such loss is covered by the policy of insurance. Automobile Ins. Co. of Hartford, Conn., et al. v. Central Nat. Bank, Savings & Trust Co., et al. (The Lakeland Cases) (C. C. A.) 20 F.(2d) 619.

The respondent insured this cargo against perils of the sea in the following language:

"And touching the adventures and perils which the said Company is content to bear and does take upon itself in the Voyage so Insured as aforesaid, they are of the Seas, * * * that have or shall come to the Hurt, Detriment or Damage of the aforesaid subject matter of this Insurance or any part thereof."

The policy also contains the following warranty:

"Warranted by the assured that this Company shall be free from claim for loss or damage to goods by wet or dampness, or by being spotted, discolored, mouldy, rusted, frosted, rotted, soured, steamed or changed in flavor, except the same is the direct result of a peril insured against."

From this wording it is clear that the policy does not cover all perils which may overtake the venture on the seas, but only those which are the direct result of actual perils of the seas. It therefore devolves upon the libelant to prove by a fair preponderance of the evidence that the cargo was directly damaged by a peril of the sea, or that the loss was due to one of the other risks assumed and insured against by the respondent. Its evidence in this regard is not satisfactory. Libelant's own witnesses state that the 400 tons of cargo that had been removed to the lighter as well as all the top stowage from the different holds and compartments of the vessel was, except for a few bags torn, delivered at destination in good condition. This testimony is most significant when the fact is considered that all witnesses agree that no water was found in the holds of the Redman and that she did not make any water as a result of the grounding. Furthermore, the expert testimony in this case is all one way and to the effect that the cargo would not take up moisture from the air.

In its effort to prove that the cargo was damaged by salt water, libelant offered in evidence two analyses of the fertilizer which were made from samples taken at point of origin and destination. The sample which was obtained from the cargo before shipment was not analyzed to show its salt content, but the second analysis which was made from the sample procured at New Orleans showed a very decided precipitate of chlorine which indicated that the cargo evidently was wet with salt water. This analysis also showed a rise in moisture content from 11.28 per cent. to 14.95 per cent. I do not attach any importance to this evidence and am satisfied

that the two analyses are irreconcilable, because it was not possible for the bags of fertilizer to have received a sufficient amount of moisture to account for this increase unless 236 tons of sea water actually entered the vessel's holds. This, of course, did not happen. In fact, the spray was not sufficient to wet through the coat of the deckman who was standing alongside of the hatch on the deck of the barge.

Libelant also contends that the voyage was delayed five days and but for this detention there would have been no damage to the burlap containers. But there is no proof in support of this claim, and even if there was, the contention overlooks a specific warranty in the policy which provides:

"Warranted free from any claim consequent upon detention or loss of time whether arising from a peril of the sea or otherwise."

It is further urged that any excessive pounding that would force a closer relationship between the jute and the fertilizer would cause the bags to deteriorate. There is undoubtedly evidence in the record to support this view, but it is based on the false assumption that the Redman did pound; whereas, as a matter of fact she did not, because she was hard and fast aground.

A consideration of these facts, together with all the other surrounding facts and circumstances of the case, in my judgment can lead to but one conclusion, and that is libelant has failed to prove by a preponderance of the evidence that the cargo was damaged by a peril of the sea. On the contrary, the evidence well justifies the conclusion that it was not good practice to load acid phosphate fertilizer in the manner stated because in the length of time it took the shipment to reach destination the jute bagging became affected by the acid nature of the fertilizer, and the pressure to which it was subjected caused adhesion of the bagging.

The libel will accordingly be dismissed, with costs.