BOAT SERVICE CO., Inc., v. NATIONAL
UNION FIRE INS. CO.

No. 17032.

Court of Appeal of Louisiana. Orleans.

Oct. 30, 1939.

Rehearing Denied Dec. 11, 1939.

708

Montgomery & Montgomery, of New Orleans, for appellant.

Terriberry, Young, Rault & Carroll and Andrew R. Martinez, all of New Orleans, for appellee.

JANVIER, Judge.

This is a suit under a policy of marine insurance. Its object is the recovery of the amount expended in repairing the damage sustained by the insured motor boat "Plaquemine" when the said vessel sank in the Mississippi River at Natchez on January, 19, 1937.

The petition alleges that defendant-insurer, in its policy, undertook to insure the vessel "against the adventures and perils of the Harbors, Bays, Sounds, Seas and Waters as above named," and that the said vessel sank "as a result of excessive and unusual wave wash from a passing steamer".

Defendant admitted the issuance of the policy and it satisfactorily appears that the loss was sustained and that the amount claimed was expended in repairing the damage caused by the sinking of the vessel. Defendant asserts that the loss did not occur as a result of a peril of the river and maintains that there is, therefore, no liability under the policy.

There was judgment for defendant and plaintiff has appealed.

The record shows that the vessel was undergoing repairs which the insurer had agreed to and that the engine, or motor, had been removed. It appears that the exhaust pipe, which provides an outlet through which exhaust gases escape from the motor and which exhaust pipe extended through the transom, or stern of the vessel, had been disconnected at the engine end and that that end had been blocked up above water level on a wood block, so that water from the river might not enter and find its way into the bilge of the boat. The outer end of the said exhaust pipe was partially submerged. At about six o'clock on the evening of the night during which the vessel sank, the caretaker had found some water in the vessel and had pumped it out and later, at about eleven o'clock, had looked at the vessel from the outside without attempting to determine, by examining the interior, whether any more water had entered. From this external examination he had concluded that the vessel was all right and was not making water.

Early on the next morning it was found that the sinking had occurred. No positive cause is shown therefor.

Plaintiff, as we have said, alleged that the sinking was caused by extraordinarily high wave wash of a passing steamer, and contends that such wave wash is included within the perils insured against, and defendant maintains that only ordinary waves from passing vessels were encountered during the night and that such ordinary waves are not to be classified as "perils" within the intendment of the policy.

Plaintiff, without having so alleged, now maintains that, even if it appears from the record that the sinking did not result from extraordinary wave wash, but was caused by water entering through the exhaust pipe after its inside end, in some manner, had become dislodged from its elevated position, and even if it does appear that the real cause of the sinking was negligence of the person who disconnected the exhaust in not firmly fixing the inside end so that it could not be dislodged and become lowered below the level of the water, still there should be recovery under the policy because of the provisions of what is known as the "Inchmaree clause", which clause, among other things, insures the vessel against perils resulting from "the negligence of master, charterers, mariners, engineers, or pilots".

Defendant attempts to meet this contention by showing, first, that the petition contains no allegation to the effect that the loss resulted from any such negligence, and, second, by pointing to a further provision in the said "Inchmaree clause" under which the negligence of such master, et cetera, cannot form the basis of recovery if the loss or damage is shown to have resulted "from want of due diligence by the owners of the vessel, or any of them, or by the Manager, Masters, Mates, Engineers, Pilots or crew".

Plaintiff has signally failed to show that the vessel, during the night on which it sank, was subjected to any extraordinary or unusual wave wash from passing vessels. The most that can be said is that the record shows that certain vessels passed, but nothing resembling positive proof that any such extraordinary wave wash resulted is to be found.

■ It is a fundamental principle of marine insurance that the insured vessel is warranted to be seaworthy. This means

that it should be able to withstand ordinary stress of weather, wind and wave to which it may be expected to be subjected and with which it will ordinarily be confronted.

In Compania de Navegacion, Interior, S. A., v. Fireman's Fund Insurance Company, 277 U.S. 66, 48 S.Ct. 459, 461, 72 L.Ed. 787, the Supreme Court of the United States, in considering what this warranty includes, said:

" * * * What does 'seaworthy' mean in the implied or expressed warranty to which the insured is to be held?

"Arnould on Marine Insurance, vol. II (10th English Ed.) says:

" 'Sec. 710. It is obvious that there can be no fixed and positive standard of seaworthiness, but that it must vary, with the varying exigencies of mercantile enterprise. "The ship," said Lord Cairns, "should be in a condition to encounter whatever perils of the sea a ship of that kind, and laden in that way, may be fairly expected to encounter" on the voyage. Steel v. State Line S. S. Co. (1877) [L.R.] 3 App.Cas. 72, 77 [4 Eng.Rul.Cas. 697]. * * *

" 'Again the class of vessel may be such as will not admit of being put into that condition of seaworthiness requisite in ordinary cases for the contemplated voyage. The effect of this is not to dispense with the implied warranty of seaworthiness, but to accommodate the warranty to what is reasonably practicable in the particular case. * * * ' "

■ And in the same opinion is found a statement clearly showing that the peril of the sea, et cetera, against which such a policy affords indemnity, includes only extraordinary stress of weather, or unusual events not ordinarily to be encountered:

"The phrase 'danger of the seas,' whether understood in its most limited sense, as importing only a loss by the natural accidents peculiar to that element; or whether understood in its more extended sense, as including inevitable accidents upon that element, must still, in either case, be clearly understood to include only such losses as are of an extraordinary nature, or arise from some irresistible force, or some overwhelming power, which can not be guarded against by the ordinary exertions of human skill and prudence."

In Western Assurance Company of Toronto, Canada, v. Shaw, 3 Cir., 11 F.2d 495, 496, the United States Circuit Court of Appeals for the Third Circuit said:

" * * * In an enlarged sense all losses from maritime adventures arise from perils of the sea, but such losses do not come under this phrase within the meaning of maritime insurance policies. 'Perils of the sea' against which underwriters insure are confined to extraordinary occurrences, such as stress of weather, winds and waves, lightning, tempests, rocks, etc. * * * The words are therefore used to describe abnormal causes and extraordinary circumstances. Coles v. [Marine] Insurance Company, 6 Fed.Cas. No. 2988, page 65; Moores v. Louisville Underwriters (C. C.) 14 F. 226; Nord-Deutscher Lloyd v. President, etc., of [Insurance Co. of] North America [4 Cir.], 110 F. 420, 49 C.C.A. 1."

■ And with particular reference to whether or not the swell or wave wash from a passing vessel constitutes a peril of the sea, the court said:

"Assuming, however, that the swell from a passing steamer did cause the barge to roll, the further question arises: Was it a 'peril of the sea,' within the meaning of the policy? Was it an extraordinary, abnormal occurrence against which the insured could not protect himself with ordinary precaution? Or was it a normal, customary circumstance that may occur at Chester every day? The passing of steamers along the Delaware between the port of Philadelphia and the sea is a normal occurrence that may be expected at any time. It was not extraordinary or unusual. It does not seem to us that waves from a passing steamer washing against the shores of the Delaware are a 'peril of the sea' against which the barge was insured."

■ It is true that no positive cause is shown for the sinking of the vessel and plaintiff maintains that, in such cases, if it is shown that the vessel was seaworthy before the loss, proof of the loss is sufficient to throw upon the insurer the duty or burden of producing proof that the cause was unseaworthiness, or at least was not a peril insured against, and there seems to be authority for this view. But this rule is applicable only where the seaworthiness of the vessel has been established and where the cause of the loss is unknown. Otherwise the burden is on the plaintiff to show that the cause of the loss was one of the perils insured against.

In Kelly, Weber & Company, Ltd., v. Franklin Fire Insurance Company, 43 F.2d 361, 363, the United States District Court for the Eastern District of Louisiana said:

"The burden of proof * * * is upon the libelant to show that the loss occurred by perils of the sea, and that it has in all respects duly complied with the terms and conditions of the policy."

In Klein v. Globe & Rutgers Fire Insurance Company of New York City, 3 Cir., 2 F.2d 137, 139, the court said:

"It is beyond dispute that the burden is upon the libelant, in a suit upon a marine insurance policy, to establish the fact that his vessel was lost or injured as the result of one of the perils contemplated by his contract."

In Corpus Juris, Volume 38, verbo "Marine Insurance", § 534, page 1177, appears the following:

"Loss—(1) Cause of Loss—(a) In General. Except in the case of a missing ship, insured has the burden of proving that the loss of, or injury to, the subject matter arose from a peril insured against. But he is not bound to show the identical cause of loss; a possible cause of loss is sufficient where the insurance is against sea perils and the vessel is shown to be seaworthy. Where no other cause of loss is shown, the presumption is that the loss arose from a peril insured against. The mere fact that after arrival cargo is found damaged by sea water, or that a vessel has defects in her hull, does not create a presumption that such damage was caused by a sea peril."

In Couch on Insurance, Volume 8, verbum "Evidence", § 2249, page 7354, is found the following:

"Marine Insurance. * * * the burden is upon the insured to establish the fact that the loss was caused by, or resulted from, a peril insured against; as, for instance, that it arose from 'the perils of the waters', or by stranding."

Here, far from showing the seaworthiness of the vessel, the record leaves the impression that the inside end of the exhaust pipe was not firmly fixed in its position above the water and that it was because of this that ordinary swell or wash of passing vessels caused it to fall below the water line. When the vessel was inspected after the sinking, it must have been apparent that the inside end of the exhaust pipe had been dislodged, because the evidence shows that it was then tied into the position in which it should have been placed originally. The marine surveyor who made the inspection stated that both the watchman in charge of the boat and Mr. Higgins, who had blocked up the exhaust pipe, had said to him that, in their respective opinions, the swells of passing vessels "had dislodged the blocking holding up the exhaust pipe and it had fallen down and allowed the water to come in". It thus appears that, instead of showing that the vessel was seaworthy prior to the loss, the proof establishes that in all probability it was unseaworthy because of the negligent manner in which this exhaust pipe had been disconnected and blocked up. Furthermore, it seems quite certain that water did not enter the vessel through the hatch, or cockpit thereof, because the evidence shows that a canvas cover was placed over this opening and carefully buttoned down around the edges.

But plaintiff maintains that, nevertheless, there may be a recovery because of the effect of the Inchmaree clause. A careful review of the pleadings, both petition and answer, as we have stated, shows not the slightest reference to this clause, nor to facts which might make it applicable.

In 14 Ruling Case Law, § 592, page 1432, it is stated that:

"The fact of a loss by a cause within the policy, and the damage caused thereby, must be alleged by the plaintiff, and where one cause of loss is alleged recovery cannot be had for a loss by another cause, without an amendment * * *."

Here there was no effort to amend.

Nor do we think that testimony concerning the blocking up of the exhaust pipe should be construed as having had the effect of broadening the pleadings in this regard. When plaintiff pitched its entire case on the allegation that the wave wash of a passing steamer had caused the sinking of the vessel and that, thus, there should be recovery because of the policy coverage against perils of the sea, river, et cetera, it made it necessary that defendant introduce evidence going to show that this was not the cause of the loss. Its evidence was, therefore, admissible in rebuttal of plaintiff's principal contention, and it is well settled that, when evidence is admissible on one branch of the case, it cannot be pointed to as having broadened the pleadings and as having introduced some other issue. Hope v. Madison, 192 La. 593, 188

So. 711; Sistrunk v. Audubon Park Natatorium, La.App., 164 So. 667; McAdam v. Soria, 31 La.Ann. 862; Jackson v. Young, 6 La.App. 854; Tensas Delta Land Company v. Ferguson, 128 La. 171, 54 So. 708.

The judgment appealed from is correct.

Accordingly, it is ordered, adjudged and decreed that the judgment appealed from be and it is affirmed at the cost of appellant.

Affirmed.