LANDRY, Judge.
Plaintiff appeals the judgment of the lower court rejecting his claim for recovery pursuant to a policy of Marine Hull Insurance, issued by defendant insurance company, covering plaintiff’s crewboat, Connelly-Kay, which vessel sank in the Atchafalaya River at Berwick, Louisiana, on the night of May 22-23, 1966. Plaintiff’s claims for statutory penalties and attorney’s fees for defendant’s alleged arbitrary refusal to pay were also denied. We affirm.
The question for decision is whether the sinking occurred either as the result of a cause covered within the “perils of the sea” insuring clause of the policy or the “Inch-maree Coverage Clause” which insures against loss by virtue of negligence of the crew.
The pertinent coverage provisions of the policy read as follows:
“Touching the Adventures and Perils which we, the said Underwriters, are contended to bear and take upon us, they are of the Seas, Men-of-War, Fire, Lightening, Earthquake, Enemies, Pirates, Rovers, Assailing Thieves, Jettisons, Letters of Mart and Counter-Mart, Sur-prisals, Takings at Sea, Arrests, Restraints and Detainments of all Kings, Princes and Peoples, of what nation, condition or quality soever, Bearrarty of the Master and Mariners and of all other like Perils, Losses and Misfortunes that have or shall come to the Hurt, Detriment or Damage of the said vessel, etc., or any part thereof; * *
“This insurance also specially to cover (subject to Average Warranty) loss of or damage to the subject matter insured directly caused by the following: * * * Negligence of Master, Mariners, Engineers or Pilots; provided such loss or damage has not resulted from want of due diligence by the Assured, the Owners or Managers of the Vessel, or any of them.”
It is conceded the vessel sank because the jam nut, which secures the stuffing box or packing gland (through which the shaft *756 penetrates the hull), carne loose allowing water to enter the boat through the stuffing box.
On the night of the accident, the vessel was moored by its operator and sole crew member, Albert A. Sons, at a 90 degree angle to the bank at approximately 6:30 P.M. Before leaving the vessel, Sons inspected the engine compartment and found it to be dry. At about 9:30 P.M., the boat was inspected by plaintiff (as plaintiff did almost daily) and its engine compartment found dry at that time. When Sons came out the following morning at 4:30 A.M., the vessel was found sunk in approximately 10 feet of water. The sinking occurred during a period of high water when con-, siderable logs and debris floated down the river. It was also shown that there is considerable large boat traffic on the Atcha-falaya River, and that heavy wave washes are to be expected at rather frequent intervals.
The expert testimony discloses that the jam nut which secures the stuffing box is a vital part of every boat’s mechanism. Its purpose is to secure the stuffing box, through which the drive shaft exits the hull, to prevent leakage. All the experts concede that a stuffing box and engine compartment inspection should precede and follow each use of a vessel, and that such an inspection should be made periodically while the vessel is in use. Customary inspection calls for a raising of the engine hood to look for water in the engine compartment. If an undue amount of water is observed, a tightening of the jam nut is called for to stop the leak. If only nominal water or a dry compartment is noted, no further inspection or precautionary measure is warranted. It is shown that jam nuts are made of brass because brass is corrosion resistant and also because it is a relatively soft metal and will not score the drive shaft which passes through it. Being of a relatively soft metal, a jam nut, therefore, tends to show wear and tear where wrenches are applied to it in the tightening processes to which the nut is repeatedly subjected.
Plaintiff produced considerable testimony showing that when the boat was raised following the sinking, the threads on the jam nut were found to be stripped, and the nut also showed evidence of considerable use and wear. Based on these circumstances, plaintiff argues that the loss occurred due to a peril of the sea because (1) the wave action of boats passing in the night caused the propeller to turn thus rotating the shaft and causing the stripped jam nut to “back up” and run up the shaft admitting water into the hull, or (2) the same result was reached by a floating log or series of logs striking the propeller during the night and causing the shaft to turn. Plaintiff alternatively contends that the loss falls within the ambit of the Inchmaree Clause in that the condition of the nut showed it was stripped because the boat operator Sons applied excessive force in tightening the jam nut some time prior to the date of the sinking.
It is settled maritime law that a Marine Policy of Hull Insurance is not an all-risk policy, and that such coverage extends only to losses resulting directly from a peril enumerated in the policy. Hazard v. New England Marine Insurance Company, 33 U.S.(8 Pet.) 557, 8 L.Ed. 1043; Union Marine Insurance Company v. Charles D. Stone & Company, 7 Cir., 15 F.2d 937; Watson v. Providence Washington Insurance Company, D.C., 106 F.Supp. 244.
An insured claiming under a policy of marine insurance must establish that his loss was due to a specified peril covered in the policy, and that he has complied with all relevant policy terms and conditions. Swan v. Union Insurance Company, 16 U.S. 168, 4 L.Ed. 361; Kelly, Weber & Company v. Franklin Fire Insurance Company, 5 Cir., 43 F.2d 361.
“Peril of the Sea” coverage has been traditionally held to insure only against extraordinary perils such as shipwreck, foundering, stranding, collision and damage resulting from violent wind and waves, *757 that constitute a peril of the sea, as distinguished from the ordinary perils which every vessel regularly and ordinarily encounters, such as depreciation, wear and tear, rot and worms and similar perils. Unless a loss occurs due to an extraordinary peril, it does not constitute a loss due to a peril of the sea as the term is used in marine insurance. Hazard v. New England Marine Insurance Company, above. Our own courts have also held that perils of the sea insured against in a policy of marine hull insurance contemplates only extraordinary dangers such as unusual weather conditions, abnormal stresses or other exceptional and unforeseen circumstances not customarily encountered. Boat Service Company, Inc. v. National Union Fire Insurance Company, La.App., 191 So. 707.
Appellant relies upon New York, New Haven and Hartford Railroad Company v. Gray, 2 Cir., 240 F.2d 460, and Allen N. Spooner & Son, Inc. v. Connecticut Fire Insurance Company, 2 Cir., 314 F.2d 753, as authority for the proposition that wave wash from passing vessels constitutes a peril of the sea in cases of this nature. Both authorities are factually distinguishable. Gray, above, involved a claim for railroad cars lost when a carfloat sank. It is readily apparent that the policy in Gray, above, covered cargo, and was not a hull insurance policy. In Spooner & Son, above, it was held under unusual circumstances that wave wash constituted a peril of the sea because all traffic on the body of water concerned had been delayed due to an extraordinary circumstance.
The clear majority rule is that the stresses of ordinary wind and wave action do not constitute perils of the sea in instances of this nature. See Continental Insurance Company of City of New York v. Patton-Tully Transportation Company, et al., 5 Cir., 212 F.2d 543, and the authorities therein cited. More particularly, our own courts have held that wave wash on the Mississippi River is a peril that faces a vessel daily, and is not unusual or extraordinary in nature so as to bring it within the classification of peril of the sea.
Plaintiff testified he checked the boat on the night before it sank. After raising the boat, he discovered that the jam nut was stripped, but he did not know how it had become so. Plaintiff theorized that the nut was stripped either because it had been excessively tightened or due to vibration or overheating. Plaintiff acknowledged the boat had undergone repair about three weeks prior to the sinking, but did not think the stripping occurred at this time because trouble with the nut would have been experienced sooner. It was plaintiff’s belief that the nut was stripped only two or three days prior to the accident.
The stripped condition of the nut was also attested by Allen Templet, boat mechanic, who examined the vessel after it was raised. He also stated the nut showed evidence of considerable wear and tear.
Thomas P. Orr, independent Marine Surveyor, visually examined the vessel after the sinking and found the jam nut in place at that time. He stated he was advised by plaintiff that the stuffing gland had become unscrewed, and that he was never informed that the jam nut was stripped. The jam nut in question was discarded after the vessel was repaired and was not available as evidence.
 We are in accord with the herein-above quoted jurisprudence to the effect that peril of the sea, in cases of this kind, envisions extraordinary and unusual perils which the vessel may not reasonably expect to encounter. Circumstances which are ordinarily encountered, such as predictable winds, tides, wave actions and conditions of the water, do not fall within the classification of perils of the sea as the term is used in policies of marine hull insurance. In this instance, waves from passing vessels were to be expected as was the possibility of floating logs due to the high water season. Plaintiff has not established by a preponderance of evidence that the ac *758 tion of waves or floating logs or debris did in fact cause the propeller to turn thus causing a stripped jam nut to back off and cause a leak. Assuming arguendo, that plaintiff had established such circumstances, it would not fall within the peril of the sea coverage of his policy.
The record is devoid of evidence establishing that the boat operator, Sons, was negligent in any manner whatsoever. The trial court found, and we concur in the finding, that Sons’ operation of the boat was in accord with practices normally followed in maritime circles. Sons made the required inspections of the engine compartment, and there is nothing of record to show that he stripped the nut by excessive tightening in the course of performing his duties.
We conclude, as did the trial judge, that the stripping of the jam nut resulted not from a peril of the sea, but from ordinary wear and tear which latter eventuality was not covered by appellant’s policy.
The judgment of the trial court is affirmed at appellant’s cost.
Affirmed.